**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-1394
_____

JANIE SLAMON, as Executrix of the Estate of James Slamon; ERIC LEWIS,
Appellants

v.

CARRIZO (MARCELLUS) L.L.C.; RELIANCE HOLDINGS USA INC; RELIANCE
MARCELLUS II LLC; BKV OPERATING LLC; BKV CHELSEA LLC
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 3:16-cv-02187)
District Judge:  Honorable Robert D. Mariani
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
January 17, 2024
_____

Before:  SHWARTZ, MATEY, and PHIPPS, *Circuit Judges*

(Filed: October 29, 2024)
_____

OPINION[*]
_____

PHIPPS, *Circuit Judge*.

After leasing out the subterranean rights to their properties in return for

compensation, including royalties on the volume of extracted natural gas sold, landowners

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

in the Marcellus Shale region of Northeastern Pennsylvania sued the lessee energy producers for breach of contract and other claims based on allegedly underpaid royalties. On behalf of two classes, the landowners claimed that the energy producers used the wrong valuation method to calculate the royalties and improperly deducted from the royalty calculation post-production costs incurred by the downstream marketers and traders. But upon the parties' cross-motions for summary judgment, the District Court rejected the landowners' claims and entered summary judgment in favor of the energy producers. The landowners appealed that final decision, *see* 28 U.S.C. § 1291, and on *de novo* review, we will affirm the District Court's judgment for the reasons below.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In April 2009, two Pennsylvania citizens, James Slamon and Eric Lewis, who owned parcels of land in Northeastern Pennsylvania, entered into substantively identical paid-up oil-and-gas leases for those properties with Carrizo (Marcellus) L.L.C., which is a citizen of Delaware and Texas.[1] A paid-up oil-and-gas lease is a contract for mineral rights in which the lessee (i) pays the lessor a lump-sum initial payment in return for the option to extract oil and gas from the land for a set period of time without any commitment to actually do so and (ii) agrees to provide other compensation to the lessor, often in the form of royalties, in return for any oil and gas actually extracted from the land. *See KEM Res., LP v. Deer Park Lumber, Inc.*, 310 A.3d 142, 144 n.1 (Pa. 2024) ("[A] paid-up oil and gas lease is '[a] mineral lease that does not provide for delay-rental payments and does not

---

[1] As a limited liability company, Carrizo takes on the citizenship of its sole member, Carrizo Marcellus Holding, Inc., which is incorporated in Delaware and has a principal place of business in Texas. *See Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 420 (3d Cir. 2010) ("[T]he citizenship of an LLC is determined by the citizenship of its members."); *see also* 28 U.S.C. § 1332(c)(1) (providing that generally a corporation is a citizen of its state of incorporation and the state where it has its principal place of business).

subject the lessor to any covenant to drill. In effect, the lessor makes all delay-rental payments, and perhaps a bonus, when the lease is signed.'" (quoting *Paid-up Lease*, *Black's Law Dictionary* (11th ed. 2019) (second alteration in original)); *cf. Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 387 n.1 (Pa. 1986) (explaining that the term "lease" in the context of the conveyance of mineral rights "is in some respects a misnomer [because w]hat is really involved is a transfer of an interest in real estate, the mineral in place"). In this case, the initial lump-sum payments were calculated at the rate of $3,500 per acre within the leaseholds, and that resulted in Slamon's initial receipt of $713,020.[2] If drilling occurred, then Slamon and Lewis would receive monthly gas production royalties for gas extracted from their properties. The amount of royalties was set at 18% of the greater of two figures: the market value of the gas or the revenues derived from the sale of the gas. Under a proviso to that clause, if the gas was sold in an arms-length transaction to an unaffiliated third party, then the first comparator, value, became the price paid to the lessee.

In August 2010, before drilling began, Carrizo assigned a 60% interest in its gas rights under the Slamon and Lewis leases to Reliance Marcellus II, LLC, a citizen of Delaware and Texas.[3] Afterwards, drilling to extract natural gas from the properties started, and Carrizo and Reliance began to sell gas to downstream marketers and traders. Carrizo sold the gas to DTE Energy Trading, Inc. And Reliance originally sold the gas to another marketer, Twin Eagle Resource Management, LLC, but after about a year,

---

[2] It may be that Slamon received a second payment in that amount as well: his lease, by its terms, was set to expire in April 2014, but it included an option to renew the lease for another three years if the lessee paid Slamon an additional $713,020 (or more if he had a higher offer in hand). The same may be true of Lewis, as both of his leases contained options to renew and, by their terms, were set to expire in April 2014 and May 2014. If both options were exercised, then Lewis received at least an additional $227,935.

[3] Reliance's sole member is Reliance Holding USA, Inc., which is a Delaware corporation with a principal place of business in Texas.

Reliance switched and sold only to DTE. Carrizo and Reliance separately negotiated with DTE, and they separately signed asset management agreements – both of which were based on a form agreement developed by an outside industry-standard organization.

Those asset management agreements used the 'netback method' for determining the price at which DTE purchased gas from Carrizo and Reliance. *See Kilmer v. Elexco Land Servs. Inc.*, 990 A.2d 1147, 1149 n.3 (Pa. 2010) (defining the netback method). After DTE bought the gas at the wellhead, it improved the gas's quality through dehydration, gathering, compression, and processing, and it transported the gas downstream for resale. The netback method accounted for those services by allowing DTE to deduct those post-production costs, which the parties have treated as including a marketing fee, from the gross amount that it received for reselling the gas, and the resulting figure constituted the price at which DTE purchased the gas at the wellhead. Thus, the price at which Carrizo and Reliance sold the gas to DTE was determined by downstream events: the gross amount that DTE received for reselling the gas reduced by its post-production costs.

Carrizo and Reliance then used DTE's netback-method purchase price as the base amount for calculating the royalties owed to Slamon and Lewis. But Slamon and Lewis did not read their lease agreements as using the price paid under the netback method as the base amount for calculating royalties. Instead, under their interpretation of the leases, royalties should be based on the greater of the gross amount received from the gas sold (before DTE subtracted its post-production costs) or the highest determination of market value of that gas sold based on a comparison of the NYMEX spot price, the local market price, and the purchase price.

That dispute formalized in 2016 when Slamon filed this class action in the Court of Common Pleas of Susquehanna County against Carrizo and Reliance. He claimed that

4

Carrizo and Reliance breached their contractual obligations under the leases by paying royalties based on the amount they received from DTE under the netback method. In addition, Slamon brought claims for breach of fiduciary duty, breach of the implied duty of good faith and fair dealing, an accounting, and a declaratory judgment.

In response, Carrizo and Reliance removed the case to the United States District Court for the Middle District of Pennsylvania. They did so based on the diversity jurisdiction provisions in the Class Action Fairness Act, which allow subject-matter jurisdiction over class actions that have an amount in controversy in excess of five million dollars, *see* 28 U.S.C. § 1332(d)(2), and a class of one hundred or more members, *see id.* § 1332(d)(5)(B), at least one of which is "a citizen of a [s]tate different from any defendant," *id.* § 1332(d)(2)(A). Those requirements were met because Slamon sought over five million dollars for the class and he was not a citizen of either Delaware or Texas, the only states in which Carrizo and Reliance have citizenship.

Once in District Court, Carrizo and Reliance moved to dismiss the claims against them for failure to state a claim for relief. That effort was partially successful: the District Court dismissed the breach-of-fiduciary duty claims but no others.

In 2017, while the case was pending, Reliance and Carrizo sold their interests in the leases to BKV Chelsea LLC, which along with its sister company, BKV Operating LLC (collectively 'BKV'), held interests in those leaseholds. After a transition period from April 2017 until March 2018, during which Carrizo and Reliance still sold the gas to DTE and made royalty payments using the netback price, BKV took full control over gas production and royalty issuance. In doing so, BKV terminated the contract with DTE and entered into a new gas marketing and asset management agreement with Concord Energy LLC. Like Carrizo and Reliance had done previously with DTE, BKV used the

5

industry-standard form agreement for that contract with Concord. And like its predecessor, Concord purchased the gas near the wellhead at a price determined by the netback method. But unlike its predecessors, BKV did not calculate royalties for Slamon and Lewis using the netback-method price; instead, BKV calculated royalties as the downstream purchase price without the deduction of downstream post-production costs.

As those developments were occurring, Slamon – and his executrix following his death – sought to expand his case. Slamon obtained leave of court and added BKV as a defendant. He claimed that BKV's method of calculating royalties, despite being more favorable to him than the method used by Carrizo and Reliance, still underpaid him. Slamon also moved to certify three classes of landowners who entered into similar leases, and the District Court certified two. Following Slamon's death, the District Court substituted his executrix in his place and, upon motion, allowed Lewis to become an additional lead plaintiff and class representative.

After discovery was completed, the parties filed cross motions for summary judgment. The plaintiffs moved for partial summary judgment on their breach-of-contract and accounting claims, and the defendants cross-moved for summary judgment on all claims. Before the District Court ruled on those cross motions, the plaintiffs sought leave to modify their pleadings again by adding two new claims – for unjust enrichment and for violations of Pennsylvania's Uniform Voidable Transactions Act. They also sought to join a new defendant, Callon Petroleum Company, which had recently purchased all of Carrizo's assets. *Cf.* Fed. R. Civ. P. 25(c) (requiring a motion to substitute a party following a transfer of interest).

Applying Pennsylvania law, the District Court granted summary judgment in favor of the defendants on every claim. *See Slamon v. Carrizo (Marcellus) LLC*, 654 F. Supp.

6

3d 405, 443 (M.D. Pa. 2023).  In light of that ruling, the District Court determined that further amendment or supplementation would be futile, and it denied the motion to file a supplemental second amended complaint.

Through a timely notice of appeal, Slamon and Lewis invoked this Court's appellate jurisdiction.  *See* 28 U.S.C. § 1291; *cf. Weber v. McGrogan*, 939 F.3d 232, 238 (3d Cir. 2019) (explaining that an order becomes final and appealable when a "plaintiff cannot amend or declares his intention to stand on his complaint" (alteration in original) (quoting *Borelli v. City of Reading*, 532 F.2d 950, 951–52 (3d Cir. 1976))); *Walker v. Coffey*, 905 F.3d 138, 143, 150–51 (3d Cir. 2018) (reviewing on appeal the denial of a motion to file a second amended complaint).  They now contest only the entry of summary judgment on their breach-of-contract claims.[4]

## DISCUSSION

### A.    The Legal Interpretation of the Lease Agreements

The preliminary questions presented at summary judgment are not factual but rather involve legal interpretations of the provisions in the leases related to royalty calculations. *See* Fed. R. Civ. P. 56(a) (providing for summary judgment when there are no genuine disputes of material fact and the movant is entitled to judgment as matter of law); *Mall Chevrolet, Inc. v. Gen. Motors LLC*, 99 F.4th 622, 630 (3d Cir. 2024); *see also Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 76 (3d Cir. 2011) ("Courts have the responsibility to determine as a matter of law whether contract terms are clear or ambiguous.").  Two clauses in particular require interpretation.

---

[4] In two sentences of their appellate briefing, Slamon and Lewis assert that the District Court erred by not granting further leave to file a supplemental amended complaint, but that assertion is not developed enough to qualify as a properly presented argument.  *See Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*, 877 F.3d 136, 145 (3d Cir. 2017) ("[W]e have consistently refused to consider ill-developed arguments or those not properly raised and discussed in the appellate briefing.").

7

The first of those is referred to as the 'no-deductions clause.' It sets the royalty rate at 18% based on the greater of the market *value* of the extracted gas or the gross *revenue* from the extracted gas – both measured at the point of take (which was undisputedly at or near the wellhead), without first deducting fees:

> Lessee shall deliver to the credit of Lessor, free of all costs (whether pre-production or post-production), a monthly Royalty equal to eighteen percent (18%) of the greater of (i) the market value, measured at the point of take, of all gas and any constituents produced from the Leasehold or lands pooled or unitized therewith, or (ii) the gross amount of revenue paid to Lessee for all gas and any constituents produced from the Leasehold or lands pooled or unitized therewith, measured at the point of take . . . .

Slamon Lease Agreement ¶ 4(b)(ii) (JA125); *see* Lewis Lease Agreement 1 ¶ 4(b)(ii) (JA359); Lewis Lease Agreement 2 ¶ 4(b)(ii) (JA373); *cf. Kilmer*, 990 A.2d at 1157 (explaining that if a royalty is 'free of' certain costs, those costs are not deducted). The no-deductions clause, however, contains a proviso related to the determination of the value of the gas when "gas production is sold in an arms-length sale transaction with an unaffiliated third party." Slamon Lease Agreement ¶ 4(b)(ii) (JA125); *see* Lewis Lease Agreement 1 ¶ 4(b)(ii) (JA359); Lewis Lease Agreement 2 ¶ 4(b)(ii) (JA373). In that circumstance, the proviso sets the value of the extracted gas as the price paid to the lessee:

> [P]rovided, however, that when gas production is sold in an arms-length sale transaction with an unaffiliated third party, the value of such gas production shall be the price paid to Lessee.

Slamon Lease Agreement ¶ 4(b)(ii) (JA125); *see* Lewis Lease Agreement 1 ¶ 4(b)(ii) (JA359); Lewis Lease Agreement 2 ¶ 4(b)(ii) (JA373).

Another provision in the leases, referred to as the 'highest-price clause,' also sets forth the method for determining the value of the gas produced. Ordinarily, the value of that gas is the highest of the local market price, the NYMEX spot price, or the price paid to the Lessee:

8

> The value of . . . gas . . . shall be determined on the basis of the greater of (i) the prevailing local market price at the time of sale or use, or, NYMEX spot price as published at the time of sale, whichever is greater, or (ii) the price paid to Lessee from the sale or use of the gas, including proceeds and any other thing of value received by Lessee . . . .

Slamon Lease Agreement ¶ 4(f) (JA126); *see* Lewis Lease Agreement 1 ¶ 4(f) (JA360) (similar language); Lewis Lease Agreement 2 ¶ 4(f) (JA374) (similar language).[5] But the highest-price clause is also subject to the same proviso as the no-deductions clause.

In application, when the conditions of the proviso are met, the comparative analysis under the highest-price clause is simplified. In that circumstance, no comparison is necessary because if gas "is sold in an arms-length sale transaction with an unaffiliated third party," then, under the proviso, "the value of such gas production shall be the price paid to Lessee." Slamon Lease Agreement ¶ 4(f) (JA126); *see* Lewis Lease Agreement 1 ¶ 4(f) (JA360); Lewis Lease Agreement 2 ¶ 4(f) (JA374).

The comparative analysis contemplated in the no-deductions clause is also simplified when the conditions of the proviso are met. In that scenario, by operation of the highest-price clause, the first comparator – market value – becomes the price paid for the gas produced. And here, where the industry-standard asset management agreements do not artificially deviate revenues from the price paid for gas – for example, there are no bonus payments for meeting specific quantity thresholds – the second comparator, revenue received, is equivalent to the price paid for the gas produced. Thus, for purposes of these specific transactions, if the conditions in the proviso are satisfied, then both comparators in the no-deductions clause (market value and gross revenue) are the same figure: the price

---

[5] Although not material to this dispute, there are a few differences in the language of the highest-price clause in the Slamon lease and the Lewis leases. The Slamon lease describes the 'prevailing *local* market price,' while the Lewis leases use 'prevailing market price,' and the Lewis leases are missing the comma after 'or' and have a definite article in front of 'NYMEX.' *Compare* Slamon Lease Agreement ¶ 4(f) (JA126) (emphasis added), *with* Lewis Lease Agreement 1 ¶ 4(f) (JA360), *and* Lewis Lease Agreement 2 ¶ 4(f) (JA374).

paid under the netback method. That figure, therefore, serves as the appropriate base level for calculating the 18% royalty rate. And so long as the lessee does not violate the free-of-costs condition by deducting any costs incurred before the point of sale from that price paid, the no-deductions provision is satisfied.[6]

For these reasons, if the conditions of the proviso were met, then the breach-of-contract claims fail as a matter of law.

### B. Satisfaction of the Conditions of the Proviso

Not surprisingly, the parties disagree sharply on whether the conditions of the proviso are satisfied. The two relevant terms of the proviso are 'unaffiliated third party' and 'arms-length transaction.' Under the meanings of those terms as construed below, there is no genuine dispute of material fact that the conditions of the proviso were met, and summary judgment was properly entered for the defendants.

#### 1. The Parties to the Asset Management Agreements Were Unaffiliated Third Parties for Purposes of the Lease Agreements.

One of the requirements for satisfying the proviso is that the downstream marketers and traders who purchased the gas from the lessors must be unaffiliated third parties. *See* Slamon Lease Agreement ¶ 4(b)(ii), 4(f) (JA125–26); Lewis Lease Agreement 1 ¶ 4(b)(ii), 4(f) (JA359–60); Lewis Lease Agreement 2 ¶ 4(b)(ii), 4(f) (JA373–74). As a term of art, the term 'unaffiliated third party' is a person who: is not a signatory to the contract; is not a subsidiary, parent, or sibling corporation with of one of the signatories; and is not subject

---

[6] Contrary to Slamon and Lewis's contention, the no-deductions clause does not require the lessee to add back in any downstream costs (let alone a third-party buyer's downstream costs) to the price paid when calculating the royalty rate; that clause simply prevents the deduction of costs incurred before the point of sale. *See Kilmer*, 990 A.2d at 1149 n.2 (identifying post-production costs as those incurred prior to the point of sale); *see also Viso v. Werner*, 369 A.2d 1185, 1187 (Pa. 1977) (requiring privity of contract for breach of contract liability).

to another form of operational control by one of the signatories to the contract that is similar in effect to corporate ownership, such as perhaps a principal-agent relationship. *See Affiliate*, *Black's Law Dictionary* (9th ed. 2009) ("A corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation."); 15 U.S.C. § 3301(27) (defining 'affiliate' under the Natural Gas Policy Act of 1978 as a "person which controls, is controlled by, or is under common control with, such person"); North American Energy Standards Board's Standard Agreement § 2.2 (JA812) (defining 'affiliate' as being "in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person" and 'control' as being "ownership of at least 50 percent of the voting power of the entity or person"); *Third Party*, *Black's Law Dictionary* (9th ed. 2009) ("A person who is not a party to a lawsuit, agreement, or other transaction but who is usu. somehow implicated in it; someone other than the principal parties."); *see generally Sunbeam Corp. v. Liberty Mut. Ins. Co.*, 781 A.2d 1189, 1193 (Pa. 2001) ("If words have a special meaning or usage in a particular industry, then members of that industry are presumed to use the words in that special way, whatever the words mean in common usage and regardless of whether there appears to be any ambiguity in the words.").

On the undisputed facts, both DTE and Concord satisfy that definition. No one asserts that DTE or Concord were parties to the leases; thus, they were third parties. Nor is there any contention that Carrizo, Reliance, or BKV were affiliated with DTE or Concord through corporate structure. Instead, the plaintiffs focus their efforts on establishing affiliation through another form of control. They point out that Carrizo, Reliance, and BKV retained some control over the downstream sales of gas produced by their wells.

11

They also emphasize that BKV characterized its relationship with Concord as one of agency. But those methods of control, even if they could qualify as a form of affiliation, all arose *after* the signing of the industry-standard asset management agreements. It is undisputed that when Carrizo, Reliance, and BKV negotiated their respective asset management agreements, which allowed for the purchase of natural gas, they lacked control over DTE and Concord. Consequently, it is not necessary to assess whether those methods of control rise to the level of corporate affiliation contemplated by the proviso because at the relevant time (when the asset management agreements were entered), none of them existed. Accordingly, when the purchase price methodology was set, DTE and Concord were unaffiliated third parties with respect to the lease agreements.

2. **The Sale of the Gas Provided for by the Asset Management Agreement Occurred Through an Arms-Length Transaction.**

The other relevant requirement for satisfying the proviso is that the transaction must be at arms length. That term is also one of art, referring to the situation in which two or more parties, acting independently and in their own economic interests, agree to do business with one another. *See Frowen v. Blank*, 363 A.2d 1267, 1268 (Pa. Super. Ct. 1976) (defining an 'arms' length transaction' as one where "each party is acting in his own best interests and realizes the other is too"); *see also U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 397 (2018) (explaining the "widely (universally?) understood definition of an arm's-length transaction: a transaction conducted as though the two parties were strangers" (citing *Arm's-Length Transaction*, *Black's Law Dictionary* (10th ed. 2014)); *Tech One Assocs. v. Bd. of Prop. Assessment, Appeals & Rev. of Allegheny Cnty.*, 53 A.3d 685, 703 n.30

(Pa. 2012) (characterizing an 'arm's length transaction' as one "untainted by any collusion or fraud").

On the undisputed facts, the asset purchase agreements negotiated between the energy producers, Carrizo, Reliance, and BKV, and the downstream marketers and traders, DTE and Concord, meet that definition. Each party had an incentive to negotiate over how to split the revenue stream, and each had an incentive to keep as much revenue for itself as possible. For Carrizo, Reliance, and BKV, that meant securing a portion of the royalties for downstream sales, but for DTE and Concord, that meant obtaining a fee per volume of gas sold. Moreover, both Reliance and BKV opted to terminate relationships with Twin Eagle and DTE, respectively, in favor of better agreements with different downstream marketers and traders. Likewise, the downstream marketers and traders adjusted their rates over time. Thus, while the asset management agreements aligned the interests of the contracting parties, as contracts often do, that does not mean that the parties to those agreements were anything more than self-interested strangers beforehand.

\* \* \*

For these reasons, the conditions of the proviso are satisfied here. Accordingly, using the netback method to determine the base amount for royalty payments is not a breach of the lease agreements, and we will affirm the judgment of the District Court.