J-A08033-22

2022 PA Super 77

| | | |
|---|---|---|
| DRESSLER FAMILY, LP | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| PENNENERGY RESOURCES, LLC, AS | : | |
| SUCCESSOR IN INTEREST TO R.E. | : | |
| GAS DEVELOPMENT, LLC | : | No. 635 WDA 2021 |

Appeal from the Order Entered April 28, 2021
In the Court of Common Pleas of Butler County Civil Division
at No(s): 2017-10357

BEFORE: BENDER, P.J.E., LAZARUS, J., and McCAFFERY, J.

OPINION BY McCAFFERY, J.: **FILED: APRIL 29, 2022**

In this oil and gas lease/breach of contract matter, Dressler Family, LP (Appellant) appeals from the order entered in the Butler County Court of Common Pleas, granting summary judgment in favor of PennEnergy Resources, LLC, as Successor in Interest to R.E. Gas Development, LLC (Appellee).[1] The issue before the trial court, as well as this Court on appeal, is whether a lease provision — setting royalties to be one-eighth (1/8th) of "gross proceeds received from the sale of [gas] at the prevailing price for gas

_____

[1] The trial court granted Appellee's motion for summary judgment, as well as denied Appellant's motion for partial summary judgment.

sold at the well"[2] — permits Appellee to deduct post-production costs from the royalties. The parties agree that gas is not, in fact, "sold at the well." The trial court concluded the royalty provision was plain and unambiguous, and it permitted the deduction of post-production costs. On appeal, Appellant argues the trial court erred in this interpretation, and in the alternative, that the lease was ambiguous.[3] We conclude the lease terms are ambiguous and thus reverse and remand.

## I. Lease Royalty Provision

The trial court summarized the following. Jacob Dressler, III, and Charlotte Dressler (collectively, the Dresslers) owned real property (the Property) in Connoquenessing Township and Lancaster Township, Butler County. In March 2007, the Dresslers

> entered into an Oil and Gas Lease (the Lease) with William McIntire Coal, Oil and Gas (WMCOG). The Lease permitted WMCOG to engage in oil and gas exploration and production operations on the Dresslers' property . . . in return for an annual payment and monthly royalties for oil and gas extracted from the Property. . . .

Trial Ct. Op., 4/28/21, at 3 (quotation marks & record citations omitted).

Paragraph 2(b) of the Lease governs the royalty payment and states:

---

[2] **See** Oil & Gas Lease, 3/14/17, at 1, Exh. 1 to Appellant's Complaint, 6/30/17.

[3] The American Petroleum Institute and the Marcellus Shale Coalition have filed a joint *amicus curiae* brief in support of affirming the summary judgment order.

> Lessee covenants and agrees to pay Lessor as a royalty for the native gas from each and every well drilled on said premises producing native gas, an amount equal to one-eighth (1/8) of **the gross proceeds** received from the sale of same at the prevailing price for **gas sold at the well**, for all native gas saved and marketed for the said premises, payable monthly.

Oil & Gas Lease at 1.

The emphasized terms above, "gross proceeds" and "sold at the well," are not defined in the Lease.  The parties agree that gas is not, in fact, sold "at the well."[4]  Additionally, the parties do not "dispute that the Lease requires [Appellee] to bear all **production** costs, which are the costs of producing the gas from below the ground and getting it to the wellhead."  Trial Ct. Op. at 5 (emphasis added).  However, as stated above, the parties disagree as to whether the royalty provision permits Appellee to deduct **post-**production costs, which are "the costs incurred after the gas is produced at the wellhead and before it is sold."  *Id.*

## II.  Facts & Procedural History

"Oil and gas production operations have been continuously conducted on the Property since the execution of the Lease in 2007."  Trial Ct. Op. at 4.  In 2009, R.E. Gas Development, LLC (Rex), became the second successor in

---

[4] Appellant's Brief in Support of Motion for Partial Summary Judgment (Appellant's SJ Brief), 7/17/20, at 1; Appellee's Combined Brief in Support of its Cross-Motion for Summary Judgment & Opposition to Appellant's Motion for Partial Summary Judgment (Appellee's SJ Brief), 10/6/20, at 10.

J-A08033-22

interest to WMCOG.[5]  In 2011, the Dresslers assigned the subsurface rights
on the Property to Dressler Family, LP (Appellant).

> For a four-year period,
>
> [f]rom January 2012 through December 2015, Rex issued monthly
> royalty payments . . . averaging . . . $35,000 for oil and gas
> production from the Property.
>
> [However, i]n May 2015, Rex informed [Appellant] that it
> [would] retroactively . . . collect[,] through offsets from future
> royalty payments, certain electric charges that Rex incurred prior
> to April 2014 while processing the oil and gas at a processing
> plant.  In addition[,] Rex has been deducting all post-production
> costs incurred.  Deductions for post-production costs have
> reduced [Appellant's] monthly royalty from an average of . . .
> $35,000 to . . . $7,800.

Trial Ct. Op. at 4 (record citations omitted and paragraph break added).

Appellant commenced the instant action by filing a praecipe for a writ of
summons on April 18, 2017.[6]  On June 30th, it filed a complaint against Rex,

_____

[5] The trial court and Appellant refer to R.E. Gas Development, LLC,
respectively, as "Rex" and "Rex Energy."  **See** Trial Ct. Op. at 4; Appellant's
Complaint, 6/30/17, at 3.  For ease of review, we adopt the same shorthand
reference, "Rex."  Furthermore, we note the trial court summarized:

> [In] 2008, WMCOG assigned its interest in the Lease to Gastar
> Exploration USA, Inc. (Gastar).  [Rex] obtained its interest in the
> Lease in 2009 when it entered into a Pooling and Unitization
> Agreement with Gastar, pursuant to which Gastar agreed to pool
> the Lease with other oil and gas leases owned by Gastar and Rex.

Trial Ct. Op. at 4 (quotation marks and record citations omitted).

[6] This case was initially assigned to the Honorable Michael Yeager.  In January
of 2021, after the parties filed cross motions for summary judgment but before

- 4 -

alleging breach of contract and unjust enrichment, and seeking a declaratory judgment. Rex filed an answer and new matter, and subsequently a motion for judgment on the pleadings, which was denied on March 28, 2018, following oral argument.

Subsequently, as a part of Rex's 2018 federal bankruptcy action, Appellee assumed the Lease, as well as "Rex's liabilities relating to or arising out of this case." Trial Ct. Op. at 4-5 (record citations omitted). Appellee was accordingly substituted, in the above caption, as successor in interest to Rex.

### III. Cross Motions for Summary Judgment

On July 17, 2020, Appellant filed a motion, along with a supporting brief, for partial summary judgment.[7] It argued: (1) there was no provision in the Lease allowing Appellee to deduct, from royalty payments, "any costs incurred after the gas leaves the well;" and (2) the clear language of the phrase, "gross proceeds" means that "royalties should be calculated using the gross sales price for the gas." Appellant's SJ Brief at 1, 6; Appellant's Motion for Partial Summary Judgment (Appellant's SJ Motion), 7/17/20, at 4-5. Appellant also pointed out that although the Lease referred to "gas sold at the well," gas was not in fact sold at the well. Appellant's SJ Brief at 1, 6. Appellant cited other

_____

oral argument was held thereon, Judge Yeager recused, and the case was reassigned to the Honorable Thomas Doerr, President Judge.

[7] Appellant averred it was entitled to judgment as a matter of law as to the interpretation of the Lease, but reserved the issue of damages.

jurisdictions — the Texas, West Virginia, and North Dakota state courts — which have interpreted "similar or nearly identical royalty language [and] determined that the term 'gross proceeds', even if accompanied by 'at the well' language, prohibited the deduction of post-production costs." Appellant's SJ Motion at 4. At this juncture, we note that some of these decisions contemplated the "first-marketable product" doctrine or "marketable product" rule. This rule "provides that because the lessee-gas company has a duty to market the natural gas, [it is] responsible for all post-production expenses until the product arrives at a downstream location where it can be marketed." *See Kilmer v. Elexco Land Services, Inc.*, 990 A.2d 1147, 1155 (Pa. 2010).

On October 6, 2020, Appellee filed a cross motion and a brief for summary judgment. It relied on the Pennsylvania Supreme Court's decision in *Kilmer*, which Appellee summarized to have "addressed in detail" "[t]he established meaning of common oil and gas royalty terms and the manner in which . . . production costs are allocated[.]" Appellee's SJ Brief at 2. Appellee averred

> the clear and unambiguous meaning of "royalty" and "at the well" in the oil and natural gas industry [permitted deduction of post-production] costs to transform the gas from the point it leaves the ground (i.e. "at the well") in its unprocessed state into a marketable and usable product. . . .

Appellee's Cross-Motion for Summary Judgment (Appellee's SJ Motion), 10/6/20, at 2. Appellee stated that *Kilmer* permitted oil and gas companies to practice the "net-back method," under which the post-production costs, of

bringing the gas from the wellhead to market, are deducted from the royalties. Appellee's SJ Brief at 3-4. Appellee also averred: (1) "[i]t is generally impractical for natural gas to be sold at the location where it leaves the ground, [*i.e.*] the 'wellhead[;]'" and (2) "post-production costs add significant value for both the lessor and operator by enabling the gas to be sold for a higher price[.]" ***Id.*** at 2-3. Appellee reasoned, "To [allow] otherwise would improperly award an enhanced royalty without requiring [Appellant] to share in the expenses [Appellee] has undertaken to increase the sale price of gas." Appellee's SJ Motion at 2-3.

Appellant disputed Appellee's contention that the royalty should be based on the value of the gas "at the downstream point of sale." Appellant's SJ Brief at 11. Appellant reasoned instead that such a calculation would: (1) contemplate "a fictional" sale price at the well; and (2) ignore "the true point of sale," as well as the lease language, "gross proceeds." ***Id.***

The trial court heard oral argument on March 15, 2021, *via* videoconference.[8] On April 28th, the court entered the underlying order, granting Appellee's motion for summary judgment and denying Appellant's

---

[8] The transcript to this hearing was not included in the certified record transmitted on appeal. Upon informal inquiry, the trial court advised that no transcript was produced. We remind Appellant's counsel the appellant bears the "responsibility to ensure that a complete record is produced for appeal." ***See Kessler v. Broder***, 851 A.2d 944, 950 (Pa. Super. 2004) (citation omitted).

motion for partial summary judgment. In so ruling, the court found the royalty provision of the Lease and clear and unambiguous, and it provided for the deduction of post-production costs.

Appellant timely appealed, and has complied with the court's order to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal.

## IV. Statement of Questions Involved

Appellant presents five issues for our review:

1. Whether the trial court erred by entering summary judgment in favor of Appellee and finding, pursuant to ***Kilmer v. Elexco Land Services, Inc.***, 990 A.2d 1147 (Pa. 2010), Appellee is permitted to deduct post-production costs from Appellant's royalties.

2. Whether the trial court erred by entering summary judgment in favor of Appellee and finding that the lease at issue is subject to only one interpretation, specifically that the prevailing price for gas must be determined by deducting post-production costs from Appellant's royalties.

3. Whether the trial court erred by entering summary judgment in favor of Appellee and finding that Appellant's interpretation of the lease would essentially adopt the "first-marketable product" doctrine in Pennsylvania.

4: Whether the trial court erred by denying Appellant's motion for summary judgment and finding that the "gross proceeds" language in Paragraph 2(b) of the lease does not prevent Appellee from deducting post-production costs from Appellant's royalty payments.

5: Whether the trial court erred by entering summary judgment in favor of Appellee because, at a minimum, the lease is ambiguous and subject to multiple interpretations necessitating further factual determinations.

Appellant's Brief at 5.

## V. Standards of Review

We first consider our standard of review of an order granting summary judgment:

> A reviewing court may disturb the order of the trial court only where it is established that the court committed an error of law or abused its discretion. As with all questions of law, our review is plenary.
>
> We view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered.

*Mitch v. XTO Energy, Inc.*, 212 A.3d 1135, 1138 (Pa. Super. 2019) (citations omitted). *See also* Pa.R.C.P. 1035.2(1) (party may move for summary judgment in whole or in part "whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional or expert report").

"[O]il and gas leases are subject to the same contract law principles that apply to contract interpretation generally."[9] *Mitch*, 212 A.3d at 1139 (citation

---

[9] This Court has observed that despite the use of the term "lease," an oil and gas lease actually involves

> a conveyance of property rights within a highly technical and well-developed industry[. T]hus certain aspects of property law as refined by and utilized within the industry are necessarily brought into play.

omitted). "[B]ecause contract interpretation is a question of law, our review of the trial court's decision is *de novo* and our scope of review plenary." ***Id.***

## VI. Appellant's Argument

While Appellant sets forth five issues in its statement of questions involved, its argument section is divided into three main arguments.[10] We review each *seriatim*.

First, Appellant maintains: (1) no terms in the Lease permit the deduction of post-production costs from royalties; and (2) the term "gross proceeds," "as opposed to the term 'net proceeds,'" contemplates the gross amount Appellee receives from the sale of gas, without any deduction for post-production costs. Appellant's Brief at 14.

Under this same section, Appellant also avers that while there is little Pennsylvania appellate court guidance on this issue, its position "has been adopted by courts in jurisdictions analyzing nearly identical language to the terms found in the [instant] Lease." Appellant's Brief at 16-22. However, in support Appellant cites decisions that have found such leases to be ambiguous or not clear: (1) ***Judice v. Mewbourne Oil Co.***, 939 S.W.2d 133, 136 (Tex. 1996) (the phrase, "[s]ettlement for gas sold shall be based on the gross

---

***Nolt v. TS Calkins & Assocs., LP***, 96 A.3d 1042, 1046 (Pa. Super. 2014) (citations omitted).

[10] We remind Appellant's counsel that "[t]he argument shall be divided into as many parts as there are questions to be argued[.]" ***See*** Pa.R.A.P. 2119(a).

- 10 -

proceeds realized at the well," was ambiguous because "[t]he term 'gross proceeds' means . . . the gross price received by" the oil company, while "value at the well means the value of the gas before it has been compressed and before other value is added in preparing and transporting the gas to market"); (2) *BlueStone Nat. Res. II, LLC v. Randle*, 601 S.W.3d 848, 857, 860 (Tex. App.-Ft. Worth. 2019) (*Bluestone*) (while the phrase "market value at the well" "has a commonly accepted meaning" that lessor will pay post-production costs, that phrase is "is at odds with" the term "gross proceeds," which "means that the royalty is to be based on the gross price received by" the lessee), *aff'd in part & rev'd in part*, 620 S.W.3d 380 (Tex. 2021);[11] and (3) *Estate of Tawney v. Columbia Natural Resources, L.L.C.*, 633 S.E.2d 22, 28 (W.V. 2006) (holding: (1) the "'wellhead'-type language" is ambiguous and imprecise because it "does not indicate how or why what method the royalty is to be calculated;" and (2) the phrase " "gross proceeds at the wellhead" "could be read to create an inherent conflict [as] the lessees generally do not receive proceeds for the gas at the wellhead," and "the phrase 'market price

_____

[11] While Appellant cites the 2019 decision by the Texas Second Court of Appeals, Appellant's Brief at 18-19, this decision was affirmed in part and reversed in part by the Texas Supreme Court in 2021. *See BlueStone*, 620 S.W.3d 380. Nevertheless, the Texas Supreme Court's decision did not disturb the portion of the Court of Appeals that we set forth above. *See id.* at 391 (rejecting lessee's argument that the lease term, "gross value received," "can be melded with an 'at the well' valuation point to produce a net-proceeds calculation," and instead concluding "'gross' and 'net' terms do not peaceably coexist").

- 11 -

at the wellhead' is unclear since it contemplates the actual sale of gas at the physical location of the wellhead, although the gas generally is not sold at the wellhead").

Second, Appellant argues the Pennsylvania Supreme Court's decision in **Kilmer** does not apply to the instant matter, where: (1) the lease in **Kilmer** explicitly permitted the deduction of certain post-production costs from royalties; and (2) the **Kilmer** "Court did not establish a rule that all royalties are subject to deductions for post-production costs[,]" nor "hold that the term 'royalty' has universal meaning within the context of oil and gas leases." Appellant's Brief at 22-24 *citing* **Kilmer**, 990 A.2d at 1150. Furthermore, Appellant contends, **Kilmer** engaged in statutory interpretation, specifically of the definition of "royalty" within the then-in effect Guaranteed Minimum Royalty Act (GMRA),[12] whereas the instant matter concerns a different issue — an alleged breach of contract. Appellant's Brief at 23-24.

Finally, Appellant alleges in the alternative that the trial court erred in not finding the royalty provision ambiguous. Appellant asserts the drafter of

_____

[12] The GMRA, 58 P.S. § 33, governed "leases between Pennsylvania landowners and gas companies seeking to drill natural gas wells into Pennsylvania's Marcellus Shale deposits." **Kilmer**, 990 A.2d at 1149. It provided that a lease must guarantee the lessor at least 1/8th royalty of all oil or gas removed from the property. **Id.** The GMRA was repealed in 2013 and replaced with the Oil and Gas Lease Act, 58 P.S. §§ 33.1 to 35.4. **See** 2013, July 9, P.L. 473, No. 66, § 1, *eff.* in 60 days (Sept. 9, 2013). An almost identical statute to the GMRA now appears at 58 P.S. § 33.3.

the Lease could have included specific and clear language as to "how the gas royalties would be calculated and what deductions would be taken[.]" Appellant's Brief at 25. Appellant also reasons the trial court was inconsistent in denying Appellee's motion for judgment on the pleadings but then, without any new facts, granting Appellee's motion for summary judgment. We conclude that relief is due to Appellant.

## VII. Contract Interpretation Principles

This Court has stated:

> The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties. The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself. The whole instrument must be taken together in arriving at contractual intent. Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed. . . .

***Mitch***, 212 A.3d at 1138-39 (citation omitted). "In construing a contract, we must give effect to all of the provisions therein. An interpretation will not be given to one part of the contract which will annul another part of it." ***Id.*** at 1139 (citation omitted).

"[W]hen the language of a contract is clear and unequivocal, courts interpret its meaning by its content alone, within the four corners of the document," and "this Court need only examine the writing itself to give effect to the parties' understanding. [We] must construe the contract only as written and may not modify the plain meaning under the guise of interpretation."

*Stephan v. Waldron Elec. Heating & Cooling LLC*, 100 A.3d 660, 665 (Pa. Super. 2014) (citation omitted).  Finally, our Supreme Court has stated:

> In the law of contracts, custom in the industry or usage in the trade is always relevant and admissible in construing commercial contracts and does not depend on any obvious ambiguity in the words of the contract.  If words have a special meaning or usage in a particular industry, then members of that industry are presumed to use the words in that special way, whatever the words mean in common usage and regardless of whether there appears to be any ambiguity in the words.

*Sunbeam Corp. v. Liberty Mut. Ins. Co.*, 781 A.2d 1189, 1193 (Pa. 2001).

> On the other hand,
>
> [a] contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.  The "reasonably" qualifier is important: there is no ambiguity if one of the two proffered meanings is unreasonable.  Furthermore, reviewing courts will not distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity.  . . .

*Mitch*, 212 A.3d at 1139 (citation omitted).

"When . . . an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances."  *Kripp v. Kripp*, 849 A.2d 1159, 1163 (Pa. 2004) (citation omitted).  "While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact."  *Id.*

## VIII. *Kilmer* Decision

At this juncture, we consider the Pennsylvania Supreme Court's 2010 decision in ***Kilmer***, on which Appellee relied in the proceedings below. In that case, the parties' oil and gas lease stated:

> . . . Lessor shall receive as its royalty one eighth (1/8th) of the sales proceeds actually received by Lessee from the sale of such production, **less this same percentage share of all Post Production Costs** . . . .

***Kilmer***, 990 A.2d at 1150 (some emphasis omitted). As Appellant points out, this lease specified that post-production costs were to be deducted from royalties. ***See id.***; Appellant's Brief at 22.

The issue before the Supreme Court was "the proper [statutory] construction of the term 'royalty' as it is used in the" Guaranteed Minimum Royalty Act. ***Kilmer***, 990 A.2d at 1149. The GMRA required an oil and gas agreement to "guarantee the lessor at least [1/8th] royalty of all oil[ or gas] removed or recovered from the subject real property." ***Id.*** at 1150. The Court stated:

> [M]any leases in the Commonwealth, including the lease at issue before this Court, calculate the royalties as [1/8th] of the sale price of the gas minus [1/8th] of the post-production costs of bringing the gas to market.[ ] This calculation is called the "net-back method," as its goal is to determine the value of the gas when it leaves the ground (hereinafter "at the wellhead") by deducting from the sales price the costs of getting the natural gas from the wellhead to the market.

*Id.* The landowners argued, *inter alia*, the lease violated the 1/8th royalty requirement of the GMRA, "given that royalties under the Lease are calculated after deducting post-production costs."[13] *Id.* at 1153.

The Supreme Court affirmed the summary judgment in favor of the gas companies. *Kilmer*, 990 A.2d at 1157-58. In so holding, the Court considered, *inter alia*, several treatises addressing the terms "royalty" and "expenses of production" as they are commonly used in the oil and gas industry: "Although the royalty is not subject to costs of production, usually it is subject to" **post**-production costs, including "costs of treatment of the product to render it marketable[ and] costs of transportation to market." *See id.* at 1157, *quoting* Howard R. Williams & Charles J. Meyers, Manual of Oil and Gas Terms § R (Patrick H. Martin & Bruce M. Kramer eds., 2009). The Court reasoned that "[c]onsistent with this definition, the lease . . . provides for the lessor to share in the post-production costs." *Kilmer*, 990 A.2d at 1158. Accordingly, the Court held "the GMRA should be read to permit the

---

[13] The landowners had filed a complaint for a declaratory judgment, asserting the same — that "the lease violated the [1/8th] royalty requirement of the GMRA because the net-back method resulted in a royalty less than [1/8th] of the value of the gas." *Kilmer*, 990 A.2d at 1150. The trial court granted summary judgment in favor of the gas companies, and the landowners appealed. *Id.* at 1150-51. Our Supreme Court exercised extraordinary jurisdiction, under 42 Pa.C.S. §726, "to consider whether the GMRA precludes parties from contracting to use the net-back method to determine the royalties payable under an oil or natural gas lease." *Kilmer*, 990 A.2d at 1151.

calculation of royalties at the wellhead, as provided by the net-back method in the Lease." ***Id.***

Appellee relied on ***Kilmer*** in the proceedings below, as well as in the instant appeal, to argue: (1) Pennsylvania practices the net-back method; (2) the terms "royalty" and "at the well" have a particular meaning in the oil and gas industry; and (3) these specialized meanings should apply when interpreting the instant Lease. ***See*** Appellee's Brief at 13-14. *Amici* advance the same argument. ***See*** *Amici* Brief at 10-11 ("[T]he Court should interpret the words in the oil and gas lease . . . not in a vacuum but in the context of the oil and gas business[,]" and "the general rule [in the industry] is that royalties are subject to post-production costs[.]").

While Appellant argues the trial court erred in applying ***Kilmer*** to reach its decision, we point out the court **rejected** Appellee's arguments relying on ***Kilmer***:

> Although ***Kilmer*** determined that the GMRA **permits** the calculation of royalties at the wellhead using the net-back method, ***Kilmer*** does not stand for the proposition that royalties at the wellhead **must** be calculated in such a manner. When defining the term "royalty" as it relates to the GMRA, the ***Kilmer*** [C]ourt relied in part upon treatises which stated that **generally** the royalty is not payable from gross profit but from the net amount remaining after post-production costs. ***Kilmer***, 990 A.2d at 1158. Parties are not prevented from entering an agreement which provides that the royalty will be based upon the gross profit.

Trial Ct. Op. at 16. The trial court then reviewed the Lease terms independent of ***Kilmer*** (discussed ***infra***).

## IX. Trial Court Opinion

Next, the trial court considered Appellant's arguments concerning *Kilmer*, including its contention that "*Kilmer* did not establish a rule that all royalties are subject to deductions for post-production costs, but merely held that the GMRA does not preclude parties from contracting to use the net-back method to determine royalties[.]" Trial Ct. Op. at 8. The court noted that "other jurisdictions are split on the issue." *Id.* It then devoted almost half of its 18-page opinion to reviewing decisions of our sister states (some of which were cited by Appellant) and the federal courts, which have addressed similar language in oil and gas leases. We summarize that the court reviewed cases that did find terms, similar to "gross proceeds" and "at the well," were in conflict or ambiguous: (1) the Texas decisions in *Judice*, 939 S.W.2d 133, and *BlueStone*, 601 S.W.3d 848 (same);[14] and (2) the West Virginia decision in *Estate of Tawney*, 633 S.E.2d 22. The trial court also reviewed decision that concluded such leases **allowed** or even required the deduction of post-production costs: *Schroeder v. Terra Energy*, 565 N.W.2d 887 (Mi. 1997); *EQT Prod. Co. v. Magnum Hunter Prod., Inc.*, 768 Fed. Appx. 459 (6th Cir. 2019); and *Bounty Minerals, LLC v. Chesapeake Exploration, LLC*, 2019 WL 7171353 (N.D.Ohio 2019). Finally, the trial court considered

---

[14] The trial court discussed the Texas Supreme Court's 2021 decision in *Bluestone*, unlike Appellant, who cited the Texas Court of Appeal's 2019 decision. *See* n.11, *supra*.

decisions that found post-production costs were **not** permitted: ***Newfield Exploration Co. v. State ex rel. N.D. Bd. of Univ. & Sch. Lands***, 931 N.W.2d 478 (N.D. 2019); and ***Rogers v. Westerman Farm Co.***, 29 P.3d 887 (Co. 2001). We note the decisions in these cases hinged on the particular definition of "at the well" accepted in those jurisdictions. Finally, the trial court observed that "[a] minority of jurisdictions have adopted the First Marketable Product Doctrine, under which the lessee is held responsible for all post-production expenses[.]" Trial Ct. Op. at 8-9.

Returning to the Lease in the case *sub judice*, the trial court concluded the Lease was plain and clear, **and** it permitted Appellee to deduct post-production costs from royalties. First, it reasoned:

> It may first appear that the phrasing in Section 2(b) of the Lease causes a contradiction because the term "gross proceeds" means an amount without deductions for costs, whereas "at the well" contemplates deductions. . . .

Trial Ct. Op. at 16. The court set forth its reasoning for this last statement — that "'at the well' contemplates deductions" — as follows:

> Since the gas is not actually sold at the well, the only logical way to determine the prevailing price for gas sold at the well is to base the price on the market value at the well. ["]Market value at the well["] is defined as ["]the value of oil or gas at the place where it is sold, minus the reasonable cost of transporting it and processing it to make it marketable.["] BLACK'S LAW DICTIONARY (8th ed. 2004). In other words, it is the value of the gas at the wellhead and excludes the additional value added through preparing and transporting the gas to market. Thus it is necessary to make adjustments to the sales price of the gas by deducting post-production costs to establish the prevailing price for gas sold at the well.

***Id.***

Although initially acknowledging the Lease terms "gross proceeds" and "at the well" may be contradictory, the trial court then reasoned:

> However, upon close review of the language utilized, the royalty provision of the Lease is subject to only one reasonable construction. The prevailing price for gas sold at the well must be determined first, and then **that full amount, without any further deductions**, is the amount used to calculate the one-eighth (1/8) portion paid to [Appellant] as a royalty.

Trial Ct. Op. at 16 (emphasis added). This discussion indicates, in contrast to the above, that post-production costs are **not** to be deducted from royalties. ***See id.***

Next, the trial court rejected Appellant's contention that royalties should be based "on the gross price at the point of sale," and in so holding, rejected any argument that Pennsylvania should adopt the first-marketable product doctrine:[15]

> Basing the royalty on the gross price at the point of sale, as [Appellant] proposes, would be contrary to the terms of Section 2(b) of the Lease because it would disregard the phrase "at the prevailing price for gas sold at the well" and use the downstream price instead. The present case is distinguishable from [other jurisdictions' cases, cited by Appellant,] in which the value of the royalty is based simply upon "gross proceeds of sale."

_____

[15] Appellant's third issue, in its statement of questions involved, is "[w]hether the trial court erred by . . . finding that Appellant's interpretation of the lease would essentially adopt the 'first-marketable product' doctrine in Pennsylvania." Appellant's Brief at 5. However, Appellant does not present any argument on this claim in its argument, and thus it is waived. ***See Lackner v. Glosser***, 892 A.2d 21, 29 (Pa. Super. 2006) ("[A]rguments which are not appropriately developed are waived.").

Accepting [Appellant's] position that the royalty should be based upon the gross amount that [Appellee] receives from the sale of the gas without deductions for post-production costs would be essentially adopting the first-marketable product doctrine. Pennsylvania Courts have not adopted the first-marketable product doctrine. . . . Hence, outcomes from jurisdictions which rely upon the first-marketable product doctrine, such as West Virginia and Colorado, have limited applicability to this case. Moreover, the plain language of the Lease does not suggest that it was the intent of the parties for the royalty calculation to be based in the manner of the first marketable product doctrine. There is no implication of any kind that the Lease intended for the royalty to be calculated at a downstream location. Instead, the Lease specifically identifies that the calculation of the royalty is to be based upon the prevailing price for gas sold at the well.

Trial Ct. Op. at 17-18.

## X. Analysis

Foremost, we observe that while both parties and the trial court aver the Lease terms are clear and unambiguous, they cite, as support, extrinsic matters. For example, Appellant extensively cites other jurisdictions' decisional authority, which hold, *contra* its position, that similar lease terms are ambiguous. Appellant's Brief at 16-19. The trial court went to great lengths to review how other jurisdictions struggled to discern the meaning of an industry term of art, applying different doctrines to resolve the disputes before them. The court also pointed out the jurisdictions' different approaches: finding ambiguity, no ambiguity and permitting post-production costs, and no ambiguity but prohibiting post-production costs. **See** Trial Ct. Op. at 9-15. Meanwhile, Appellee and the trial court rely on **Kilmer** and specialized industry meanings to argue what "gross" and "at the well" should

mean. *See* Trial Ct. Op. at 16; Appellee's Brief at 14. Additionally, Appellee cites policy considerations (consistent with net-back method): (1) "[t]he oil and gas industry has changed over time such that, in more recent times, there is generally not a market to sell natural gas at the wellhead[;]" (2) "[t]he activities that generate post-production costs add significant value for both the operator and the lessor by enabling the gas to be sold for a higher price[;]" and (3) operators and lessors should "fairly share the expenses of bringing raw gas from the wellhead to the point of sale[.]" Appellee's Brief at 2-4.

We do not, at this juncture, opine on the merits of the parties' arguments or the trial court's reasoning, but emphasize that they go outside the four corners of the Lease and cite multiple sources to conclude the Lease is clear and unambiguous. A finding that a contract is clear and unequivocal, however, must be made on the contents of the contract "**alone**, within the four corners of the document." *See Stephan*, 100 A.3d at 665 (emphasis added).

We conclude the royalty provision contains a latent ambiguity, as "it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *See Mitch*, 212 A.3d at 1139. As stated above, the Lease provides that royalties are "equal to [1/8th] of the gross proceeds received from the sale of same at the prevailing price for gas sold at the well." Oil & Gas Lease at 1. While the lease specifically refers to the "sale" of gas "at the well," both parties agree that gas is not, in fact, sold at the well.

*See Kripp*, 849 A.2d at 1163 (latent ambiguity latent is created by extrinsic or collateral circumstances).

Appellee maintains the oil and gas industry has evolved such that there is generally no market to sell natural gas at the wellhead. Appellee's Brief at 2; *see also* *Amici* Brief at 6, 7 ("Before deregulation of the natural gas industry [following the Natural Gas Policy Act of 1978[16]], production companies generally sold natural gas . . . in the field at or near the wellhead[,]" but subsequently, "pipeline companies would perform all post-production activities . . . after the point of production at the wellhead to sell natural gas downstream of the well."). Appellee and the trial court both reason that we may look to the industry usage of the terms "royalty" and "at the well" to reconcile this conflict.

We acknowledge the trial court and Appellee's rationale that industry terms can comprise the plain language and meaning of a contract. We agree with Appellee that "'custom in the industry or usage in the trade is . . . relevant and admissible' in construing a contract and does not depend on an ambiguity in the agreement." *See* Appellee's Brief at 12, *quoting* **Sunbeam Corp.**, 781 A.2d at 1193. However, we disagree that this rule can so neatly apply to the case *sub judice*.

---

[16] 15 U.S.C. §§ 3301–3432.

In **Sunbeam**, the case cited by Appellee, commercial "insurance policies cover[ed] pollution if it was 'sudden and accidental.'" **Sunbeam Corp.**, 781 A.2d at 1192. The policy holders argued that according to industry usage, "'sudden and accidental" meant "unexpected and unintended." **Id.** The trial court disagreed, as it was bound by Superior Court precedent, "which held 'the plain meaning of [the phrase 'sudden and accidental] requires that damages resulting from gradual releases of pollution are excluded from coverage.'" **Id.** at 1194. On appeal, our Supreme Court held the trial court could take into account the special industry usage of the term, and remanded for the court to reexamine the policy language. **Sunbeam Corp.**, 781 A.2d at 1195.

With respect to the Lease in the case *sub judice*, we note the common, ordinary meaning of the word "gross" is "[e]xclusive of deductions." **See** AMERICAN HERITAGE COLLEGE DICTIONARY (3d. ed. 2000). As Appellant points out, the royalty provision does not specifically address post-production costs. The trial court and Appellee, however, argue, that consistent with the specialized industry meanings of "royalties" and "at the well," "gross" has the opposite meaning: it **includes** the deduction of certain costs. Trial Ct. Op. at 16; Appellee's Brief at 13. Likewise, the phrase "price for gas sold at the well" has a common sense meaning — the price of gas as it is sold from the wellhead. The trial court and Appellee again advance a contrary meaning: the value of gas sold **after** it leaves the well, with an additional caveat that "the

reasonable cost of transporting it and processing it to make it marketable" should be deducted. *See* Trial Ct. Op. at 16.

We offer no opinion on the veracity of Appellee's and *amici's* contentions that these terms have the specialized industry meanings discussed above. Instead, we disagree that such industry meanings are comparable to those in *Sunbeam Corp.*, such that they may so easily be interchanged with the original Lease terms. As stated above, in *Sunbeam Corp.*, the question was whether the insurance policy phrase, "sudden and accidental," could have a nuanced, industry meaning of "unexpected and unintended." *Sunbeam Corp.*, 781 A.2d at 1192. Here the trial court and Appellee interpret "gross" and "price for gas sold at the well" to each have the very opposite meaning. Such interpretations support a finding that the royalty provisions are not clear and are ambiguous.

Furthermore, the trial court's own discussion of *Kilmer* and the net-back method does not support a finding that these terms "are known and understood by a particular class of persons in a certain special or peculiar sense." *See Sunbeam Corp.*, 781 A.2d at 1195. The trial court specifically found "*Kilmer* does not stand for the proposition that royalties at the wellhead **must** be calculated in" the net-back method. Trial Ct. Op. at 16, 17.

We appreciate the complexity of the issues presented and the parties' and *amici*'s advocacy in this appeal. However, in sum, we disagree with the trial court's finding that the royalty provision terms are plain and unambiguous

with regard to whether Appellee may deduct post-production costs from royalties. Instead, under our *de novo* standard of review, we conclude the royalty provision is ambiguous. ***See Mitch***, 212 A.3d at 1139.

Accordingly, we reverse the order of the trial court granting Appellee's motion for summary judgment and denying Appellee's motion for partial summary judgment. Furthermore, as "ambiguous writings are [to be] interpreted by the finder of fact," we remand this case to the trial court for further proceedings. ***See Kripp***, 849 A.2d at 1163. We note that on remand, the trial court may consider, *inter alia*: whether it should apply the accepted meanings, in the oil and gas industry, of "gross proceeds" and "at the well;" the contractual intent of the original Lease parties who executed the Lease in 2007;[17] whether gas was ever sold at the wellhead under this Lease; the subsequent conduct or course of performance of WCMOG and its successors in **not** deducting post-production costs for eight years, from 2007 to 2015; and any other factors advocated by the parties or found to be relevant by the trial court.[18] Again, we characterize these issues to be parol evidence, outside the four corners of the Lease, and relevant only after we have determined the Lease is ambiguous.

---

[17] It is not apparent from the record whether the original lessors, Jacob Dressler, III, and Charlotte Dressler, play a role in the operation of Appellant, Dressler Family LP.

[18] We offer no opinion as to the merits of these potential factors.

Finally, we observe *amici* has urged this Court to endorse the net-back method, and to reject the "flawed" first-marketable product doctrine. ***See*** *Amici* Brief at 22. They reason that if we accept Appellant's interpretation of the Lease, we "would be endorsing all the hallmarks of the marketable-product doctrine without saying so[,]" and "may disrupt the legal framework for royalties in Pennsylvania on which parties to an oil and gas leave have relied." ***Id.*** at 9, 25. We enter no conclusion as to the proper meaning of the royalties provision of the Lease, but instead conclude the provision is ambiguous and remand to the trial court to determine the proper meaning.

## XI. Conclusion

For the reasons set forth above, we reverse the order of the trial court granting Appellee's motion for summary judgment and denying Appellee's motion for partial summary judgment. We remand this case to the trial court for proceedings consistent with this opinion. We again emphasize that we offer no opinion as to the merit of the parties' various arguments regarding the meanings of the Lease terms.

Order reversed. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 04/29/2022

- 27 -