J-A23003-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| ERIC & JULIE LEWIS | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellants | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MICHAEL WARREN MUNDA & | : | No. 180 MDA 2023 |
| MELISSA STEVENSON | : | |

Appeal from the Judgment Entered March 13, 2023
In the Court of Common Pleas of Susquehanna County Civil Division at
No(s):  2021-951 CP

BEFORE:   LAZARUS, J., McLAUGHLIN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, J.:                    **FILED: MARCH 21, 2024**

Plaintiffs Eric Lewis (Eric) and Julie Lewis (Julie) (collectively, Appellants), appeal from the order, entered in the Court of Common Pleas of Susquehanna County, finding that Defendants Michael Munda and Melissa Stevenson[1] (collectively, Appellees), owe Appellants $2,215.00 jointly-and-severally, and additionally, that Stevenson owes Appellants $21,550.00 for which Munda is not jointly-and-severally liable.  Upon careful review, we vacate and remand for correction of the damages owed and the entry of judgment in favor of Appellants and against Appellees for $2,215.00 owed jointly-and-severally by Appellees, and for $19,350.00 for which Stevenson is solely liable.

---

[*] Former Justice specially assigned to the Superior Court.

[1] Stevenson did not defend this action.

This matter arises from a tenant-landlord dispute. The trial court recited its findings of fact as follows:

[Appellants] own a rental property at 870 Brush Road, Montrose, Pennsylvania [(Property)]. [Appellees] entered into a residential lease agreement for [the P]roperty with the lease term of 12 months[,] running from May 1, 2018[,] through April 30, 2019[,] with a monthly rental fee of $2,000[.00].

At the inception of the lease, [Appellees] deposited $4,000[.00] with [Appellants] to cover the security deposit ($2,000[.00]) and the last month's rent ($2,000[.00]). [] Munda [] never permanently resided at the residence but entered into the lease with his [then-]girlfriend, [] Stevenson[], to assist her in finding a home.

Munda would occasionally stay at the [P]roperty[,] but it was not his personal residence. The initial lease period expired on April 30, 2019[,] but Stevenson continued to reside [there]. The parties never entered into a new lease agreement. Pursuant to the terms of the written lease, the parties then began a month-to-month lease agreement subject to the same terms of the 2018 written lease agreement.

Munda['s] and Stevenson's relationship ended in October 2019[,] and Munda ceased staying at the leased premises. Under the terms of the lease agreement, Munda and Stevenson were jointly and severally liable for the rental payments. Despite the end of the relationship [between Appellees,] and Munda no longer staying at the residence, Munda continued to pay the rental payments for Stevenson through February 2020. Neither Munda nor Stevenson paid the March 2020 or April 2020[2] monthly rent.

On April 9, 2020, [] Eric [] notified Munda by text message that rent was delinquent for March and April 2020. [That same day,] Munda responded by text message, noting that he had already

_____

[2] The April 2020 rent was paid to Appellants at the outset of the agreement in 2018, when the Appellees deposited the "last month's rent." And, although the last month of the original lease term was April 2019—at which point the lease converted to month-to-month—the parties appear to have agreed to Appellants' retention of that rent payment through April 2020, and for it to be applied for Appellees' rent owed for April 2020.

told [Eric, sometime in December 2019,] that he would not be renewing the lease and that [Eric] should contact Stevenson to see if she wanted to renew the lease. Munda suggested that there was only rent due for March as the "last month's rent" (April 2020) had been paid at the inception of the lease agreement. Munda's communication made clear that Munda was providing notice that he was terminating the lease agreement.

[Eric] responded by noting that if Stevenson wanted to stay, she would need to sign a new lease agreement. Thereafter, on May 1, 2020, Munda tendered a $2,000[.00] check to [Eric], which initially did not clear, but did clear at a later date. Rather than applying this check to the back rent for either March 2020 or April 2020, [P]laintiffs applied Munda's check to [the] rent for May 2020. [Appellants] incurred a $15.00 fee as a result of Munda's check not initially clearing.

On May 11, 2020, [Eric] sent Munda a text message notifying him that no new lease agreement had been signed and the prior lease agreement was now in a month-to-month tenancy. Munda reiterated that he believed that the lease had expired on May 1[, 2020].[3] On June 22, 2020, [Eric] sent Stevenson a proposed new lease agreement for her alone and agreed that the monthly rental payment would be reduced for July 2020 to $1,000[.00] per month and thereafter return to the prior amount of $2,000[.00] per month.

On June 25, 2020, Stevenson notified [Eric] by text message that she no longer wanted Munda included in their conversations and that she wanted to communicate with [Eric] privately so that Stevenson []could handle [her "]own affairs."

_____

[3] The parties appear to have been under the mutual mistaken belief that the lease converted to a month-to-month lease in May 2020. The record supports the trial court's finding that the lease converted to month-to-month in May 2019, as there was only one 12-month term provided for under the terms of the lease. *See* Residential Lease Agreement, undated, at ¶ 2. Further, the record supports the trial court's finding that Munda's notice of termination was effective May 31, 2020, and Munda was released for June 2020 and beyond. *See* Amended Trial Court Opinion, 1/26/23, at 8 n.7.

Pursuant to this proposed new lease agreement,[4] Stevenson paid and [Eric] accepted the sum of $1,000[.00] for the July 2020 rent. Consistent with the unsigned lease agreement between Stevenson and [Appellants], Stevenson paid [Appellants] $2,000[.00] in rent in August 2020, September 2020[,] October 2020, November 2020[,] and April 2021. Stevenson failed to pay the $2,000 month[ly rent payment] for June 2020, December 2020, January 2021, February 2021, March 2021, May 2021, June 2021, July 2021[,] and August 2021. Stevenson also failed to maintain the [P]roperty in the summer of 2021[,] requiring [P]laintiffs to pay a third party[,] expending $450.00 in lawn maintenance.

The lease agreement provided for a $100[.00] late fee for any late payments. Because 10 payments were never made, and are therefore late, there are currently $1,000[.00] in late fees due to [P]laintiffs.[5] Stevenson [] vacated the [P]roperty by September 2021. [Appellants] discovered extensive damage inside the residence[,] which exceeded[6] the amount of the security deposit of $2,000.00. The total amount of rental payments that have not been made total $20,000[.00].

Amended Trial Court Opinion, 1/26/23, at 1-5 (citations, footnotes, and paragraph numbers omitted).

On January 13, 2022, Appellants filed a complaint in this matter and the parties initially proceeded to arbitration, after which an award was entered for

---

[4] Despite couching its findings in terms of the parties acting pursuant to, and consistent with, the proposed new lease agreement, the trial court expressly found that there was no new lease between the parties, and that, instead, after May 31, 2020, Stevenson was a holdover tenant under the original lease. *See* Amended Trial Court Opinion, 1/26/23, at 8-9.

[5] Despite this factual finding, we observe that the trial court identified 11 late fees owed (March 2020, May 2020, June 2020, December 2020, January 2021 through March 2021, and May 2021 through August 2021), amounting to $1100 in late fees, and the trial court further acknowledged that no late fee was owed for April 2020, as that payment was made at the inception of the lease and credited as "last month's rent."

[6] There is no claim relating to the alleged damages or the security deposit on appeal.

- 4 -

Appellants. An appeal was taken from the arbitration award, and the trial court conducted a *de novo* bench trial on November 7, 2022. The trial court issued an order on November 15, 2022, finding that Munda and Stevenson were jointly-and-severally liable for $215.00, and that Stevenson was also solely liable for $21,450.00. Appellants filed a motion for reconsideration on November 22, 2022, which the court granted. On January 26, 2023, the trial court heard oral argument on the motion for reconsideration, and, on that same day, issued a revised order, finding Munda and Stevenson jointly-and-severally liable for $2,215.00, with Stevenson also solely liable for $21,550.00. Appellants timely filed this appeal.[7] Appellants and the trial court have complied with the requirements of Pa.R.A.P. 1925.

On appeal, Appellants raise the following issues for our review:

1. Whether the trial court erred in [interpreting] the parties' lease agreement to permit notice by electronic communication when the parties' lease made no reference to electronic communications and was otherwise unambiguous as to the requirements the parties agreed upon to effectuate proper notice under the lease agreement?

2. Whether the trial court erred in finding [] Munda could unilaterally terminate the parties' lease agreement based upon the language of the parties' lease agreement?

---

[7] Our initial review of the trial court docket revealed that no judgment had been appropriately entered. We issued an order on March 8, 2023, directing Appellants to praecipe the trial court prothonotary to enter judgment on the decision of the trial court based upon ***Brown v. Philadelphia Coll. Of Osteopathic Med.***, 760 A.2d 863, 865 n.1 (Pa. Super. 2000) (reiterating appeal properly lies from judgment entered). Appellants filed a certified copy of the trial court docket on March 17, 2023, showing that judgment was properly entered on the verdict on March 13, 2023.

3. Whether the trial court erred in finding [] Munda jointly-and-severally liable with [] Stevenson for only a portion of the outstanding damages where the parties' lease agreement contained a joint-and-several liability clause, renewal clause, [and] integration clause, amongst other clauses, and where no new lease was entered into to terminate the existing lease?

Appellants' Brief, at 5 (reordered for ease of disposition).

In Appellants' first issue,[8] they claim that the trial court erred in finding that Munda was permitted to terminate the lease via text message to Eric because the lease did not expressly permit electronic communications or electronic termination. Specifically, Appellants argue that, in sending any text message to Eric, Munda did not satisfy the requirements of the relevant notice provision of the lease—paragraph 27—which provides the following:

27. NOTICES. All notices and communication under this Lease shall be in writing and shall be deemed to be properly given when delivered personally or sent by certified mail, return receipt requested, to Tenant at the address of Premises, or to the Landlord as described above at the address first written above or to such address either party may specify in writing to the other.

Residential Lease Agreement, undated, a ¶ 27. Appellants' urge that the plain meaning and syntax of the contract provides that notices may only be: (1) in writing and (2) delivered to Appellants at their personal address as set forth in the lease. Appellants are not entitled to relief on this first issue.

_____

[8] Appellants combine the three issues raised in this appeal into only two subparts in the argument section of their brief, in violation of Pa.R.A.P. 2119(a).

A lease is a contract that is controlled by principles of contract law. ***Pa. Envt'l. Def. Found. v. Commonwealth***, 255 A.3d 289, 304 (Pa. 2021). Our standard of review regarding contract interpretation is well-established:

> Because contract interpretation is a question of law, this Court is not bound by the trial court's interpretation. Our standard of review over questions of law is *de novo* and to the extent necessary, the scope of our review is plenary as the appellate court may review the entire record in making its decision. However, we are bound by the trial court's credibility determinations.

***Rosiecki v. Rosiecki***, 231 A.3d 928, 933 (Pa. Super 2020) (citation omitted). Also, we are not limited by a trial court's rationale, and we may affirm its decision on any basis. ***See Blumenstock v. Gibson***, 811 A.2d 1029, 1033 (Pa. Super. 2002).

> The paramount goal of contract interpretation is to ascertain and give effect to the parties' intent. To accomplish this goal, each and every part of the contract must be taken into consideration and given effect, if possible, and the intention of the parties must be ascertained from the entire instrument.

***Tuthill v. Tuthill***, 763 A.2d 417, 419 (Pa. Super. 2000) (citation omitted). Also, our Supreme Court has repeatedly reiterated that parties to an agreement have the right to make their own contract and "it is not the function of the Court to rewrite it[] or give it a construction in conflict with the accepted and plain meaning of the language used." ***Robert F. Felte, Inc. v. White***, 302 A.2d 347, 351 (Pa. 1973) (citation and quotation marks omitted).

Pennsylvania Courts interpret a contract first by looking to its plain meaning to give effect to the intent of the parties:

[T]he intent of the parties to a written contract is to be regarded as being embodied in the writing itself, and when the words are clear and unambiguous[,] the intent is to be discovered only from the express language of the agreement. . . . [W]hen a written contract is clear and unequivocal, its meaning must be determined by its contents alone. It speaks for itself and a meaning cannot be given to it other than that expressed. Where the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence. Hence, where language is clear and unambiguous, the focus of interpretation is upon the terms of the agreement as manifestly expressed, rather than as, perhaps, silently intended.

*Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982) (citations and quotation marks omitted).

However, if the contract terms are ambiguous, the Court may receive extrinsic evidence to resolve the ambiguity. *Tuthill*, 763 A.2d at 420. Nevertheless, a contract is not ambiguous merely because parties do not agree on the proper construction, nor is there any ambiguity "if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends[.]" *Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (Pa. Super. 1993) (citation omitted).

Pennsylvania courts presume that parties choose contract language specifically and carefully:

[The] court does not assume that contractual language is chosen carelessly, nor does it assume that the parties were ignorant of the meaning of the language they employed[.] . . . [B]efore a court will interpret a provision . . . in a contract in such a way as to lead to an absurdity or make the . . . contract ineffective to accomplish its purpose, it will endeavor to find an interpretation [that] will effectuate the reasonable result intended.

*Binswanger of Pa., Inc. v. TSG Real Estate LLC*, 217 A.3d 256, 262 (Pa. 2019) (citations, quotations marks, and brackets omitted).

As to the issue of ambiguity, we have previously explained that a contract provision is ambiguous if, and only if:

> it is reasonably susceptible to different constructions and capable of being understood in more than one sense. Where a provision of a contract is ambiguous, it is to be construed against the drafter of the agreement. Further, when an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances.

*Enter. Bank v. Frazier Family L.P.*, 168 A.3d 262, 265 (Pa. Super. 2017) (citations, quotations marks, brackets, and ellipses omitted); *see also Krizovensky*, 624 A.2d at 642 ("A contract will be found to be ambiguous[] if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning.").

Unambiguous contracts are interpreted by the court as a matter of law, whereas ambiguous contracts are interpreted by the fact finder. *Family v. Pennenergy Res., LLC*, 276 A.3d 729, 737 (Pa. Super. 2022).

Here, although we agree with Appellants that there is no ambiguity in the lease, we find the trial court did not err in concluding that Munda satisfied the plain meaning notice requirements of paragraph 27 of the lease agreement

when sending a termination notice via text message in April 2020.[9] *See* Residential Lease Agreement, undated, at ¶ 27. Indeed, Munda sent a text message, which is a "writing," to Eric, which plainly satisfies the requirement that the written notice be "delivered personally." *Id.* The "address first written above" mentioned in paragraph 27 relates only to the option to mail notices and does not plainly relate to the other option of personal delivery, which may be effectuated anywhere by the plain terms of the lease. At trial, Eric confirmed his receipt of Munda's text message terminating the lease, and

---

[9] The trial court found that the notice provision of the lease agreement did not apply to Munda's text communication, and found, in the alternative, that **even if it did apply, Munda's text message was in writing, personally received, and acknowledged by Eric**. *See* Amended Trial Court Opinion, 1/26/23, at 6 n.4. We conclude that the notice provision is applicable to Munda's April 9, 2020 termination communication insofar as the text message qualifies as a "communication under th[e] Lease," *see* Residential Lease Agreement, undated, at ¶ 27, and especially because paragraph 2 of the lease agreement provides:

> 2. TERM. The term of this Lease will be for: twelve months commencing on May 1, 2018 and ending on April 30, 2019 unless sooner terminated according to the provisions hereof. Upon expiration, said Lease will renew automatically month to month **until terminated by either party on thirty days written notice**.

Residential Lease Agreement, undated, at ¶ 2 (emphasis added). The trial court determined that Munda and Eric's text messages in April 2020 created an agreement to terminate the month-to-month tenancy effective May 31, 2020, which is consistent with the terms of the lease and the record in this matter. Indeed, paragraph 2 of the lease required 30 days' written notice, *see id.*, and the parties' text messages support the trial court's finding that the agreement was for Munda to be released from the month-to-month tenancy at the end of May 2020.

acknowledged he replied to Munda's response that same day. *See* N.T. Trial, 11/7/22, at 11. It is of no moment that the notice provision of the lease, or any other provision thereof, fails to explicitly mention or permit the possibility of termination through electronic means because Munda's text message was in writing and delivered personally to Eric, satisfying the plain meaning requirements of the lease.[10] *See Steuart*, 444 A.2d at 661. Further, we observe that the lease agreement does not specifically require a form of notice for termination, or define "electronic notices," or limit or prohibit the use of a text message for providing notice. Munda's April 9, 2020 text message to Eric plainly satisfies the requirement that the notice of termination be a writing personally delivered, and, therefore, Appellants are entitled to no relief on their first issue.

In Appellants' second issue, they argue that the trial court erred because it permitted Munda to unilaterally terminate the lease agreement. Specifically, Appellants claim that this case presents a matter of first impression for the appellate courts of this Commonwealth and urge that we adopt the "Kentucky

---

[10] Although never physically entered into evidence, Munda testified that he also hand delivered a letter to Eric at his home to terminate the lease on May 1, 2020. *See* N.T. Trial, 11/7/22, at 41 ("Q: Did you ultimately go to [Eric's] house? A: Yes. [] I went to his house that night with my wife[—]I had gotten remarried [] December of [20]19[—]to explain to [Eric] that I haven't been with [Stevenson], I'm not with [Stevenson], I'd like to not be on the lease going forward. If he wants to renew the lease[,] I'm no longer going to be on it. [S]o **I also brought him a letter because in his lease[,] he [] indicated it had to be a letter [] to break[ the] lease**.") (emphasis added).

Rule" as the correct statement of Pennsylvania law under these circumstances, where a jointly-and-severally liable co-tenant attempts to unilaterally terminate their residential lease when their co-tenant remains in possession of the leased land. **See** Appellants' Brief, at 11-12, citing **Caudill v. Acton**, 175 S.W. 3d 617, 618 (Ky. Ct. App. 2004). Further, Appellants claim that the appropriate remedy here should be between Appellees via a separate cause of action for the right of contribution. Appellants argue that the joint-and-several liability provision of the lease governs here and provides the security sought by Appellants when they initially signed the lease. **See** Residential Lease Agreement, undated, at ¶ 30. Appellants are entitled to no relief on this issue.

Instantly, although perhaps a question of first impression on the narrow factual issue presented, we think it useful to reframe this question to one of whether one co-lessee may unilaterally holdover and continue to subject the other co-lessee to liability in perpetuity. We agree with the decision of the trial court and find the issue is answered by reference to existing Pennsylvania caselaw.[11] **See Willis-Winchester Co. v. Clay**, 143 A. 227, 229 (Pa. 1928) ("A tenant in common cannot ordinarily make a lease binding on his cotenants[.]"). Indeed, it has long been the law of this Commonwealth that

---

[11] Although we may look outside the jurisdiction for legal authority, and the parties and trial court have cited to case law from our sister courts, that authority is only persuasive and not mandatory. **See Sternlicht v. Sternlicht**, 822 A.2d 732, 742 n.9 (Pa. Super. 2003) (citation omitted) ("While the pronouncements of courts in sister states may be persuasive authority, those pronouncements are not binding on this Court.").

where parties have shared rights with respect to land, one may not bind the other without authorization. ***See McKinley v. Peters***, 3 A. 27, 28 (Pa. 1886). And, although this pronouncement of law has previously been decided from the perspective of co-landowners or co-lessors, it is equally applicable here, where co-lessees disagree on how to exercise their shared rights. ***See also Dible v. Davis***, 52 Pa. Super. 18, 22 (Pa. Super. 1912) ("[O]ne of two cotenants cannot, without the knowledge or assent of the other, bind the latter to an extension of the term, an increase in the rent or other like obligation."). Were it otherwise, one co-lessee who wishes to remain in possession could essentially hold the other co-lessee hostage—despite the other co-lessee vacating the premises and giving proper notice to the lessor—by the simple expedient of remaining in possession during a holdover. In essence, the co-lessee in possession could refuse to pay under the terms of the lease and obtain a perpetual lease, subject only to the lessor's right to bring an action in ejectment, and, despite giving proper notice of termination to the lessor and vacating the premises, the co-lessee who is out of possession could remain liable for their co-lessee's holdover in perpetuity. Indeed, this result would also be inconsistent with longstanding Pennsylvania agency law. ***See First Nat'l Bank v. St. John's Church***, 146 A. 102, 104 (Pa. 1929) ("A principal can ratify the unauthorized act of an agent only when he has knowledge thereof."); ***McCullough's Petition***, 119 A. 585, 586 (Pa. 1923) ("[O]ne tenant[-]in[-]common has no power to bind his cotenant by an agreement to lease their land."); ***Caveny v. Curtis***, 101 A. 853, 854 (Pa.

1917) ("Under ordinary circumstances neither tenant-in-common can bind the estate or person of the other by any act in relation to the common property, not previously authorized or subsequently ratified, for cotenants do not sustain the relation of principal and agent to each other, nor are they partners . . . **A contract by one tenant-in-common in relation to the whole estate being voidable at the election of his cotenants not joining in said contract.**") (citation and quotation marks omitted; emphasis added); **Bernstein v. Colletris**, 99 Pa. Super. 484, 488 (Pa. Super. 1930) ("Proof of a joint owner's own declarations cannot establish his authority as agent for all the owners."). Here, there is no agency or partnership relationship between Appellees, and Stevenson could not, without Munda's knowledge or assent, bind him to an extension of the term, an increase in the rent, or other like obligation.[12]

In Appellants' final issue, they argue that the court erred in determining Munda was jointly-and-severally liable for only a portion of the damages sought. They are entitled to no relief.

Here, at the outset, we have already held above that Munda was permitted to terminate the lease unilaterally under these circumstances and did so properly according to the terms of the lease requiring the termination notice be in writing and delivered personally to Appellants. The trial court

---

[12] To Appellants' concern about the perceived reliability of joint-and-several liability clauses in this Commonwealth considering our disposition, we reiterate that, pursuant to the terms of the lease, the protections of joint-and-several liability are afforded to Appellants up to the point that the contract terminated.

- 14 -

found that Munda conceded he was responsible under the original lease through May 31, 2020. *See* Amended Trial Court Opinion, 1/26/23, at 8 n.7. Munda has not challenged that determination and it is supported by the record. Therefore, we agree that Munda was no longer bound by the joint-and-several liability clause for any holdover occurring after May 31, 2020— the effective date of Munda's notice of termination.

As to liability for missed payments occurring after May 31, 2020, the trial court found that Stevenson was solely liable as the only holdover tenant:

> [Eric] and Stevenson engaged in negotiations for a new lease agreement. As a result of these negotiations, [Eric] sent Stevenson a new lease agreement and encouraged Munda and Stevenson to work out how the previous monies placed in escrow would be utilized, i.e. whether the security deposit and the last month['s] rent would be applied to back rent or carried over to the new lease. Stevenson requested that [Eric] contact her directly so she could "handle her own affairs." Pursuant to those direct negotiations between [Eric] and Stevenson[, in] which Munda was not a participant, [Eric] accepted a reduced rental payment in July 2020 for $1,000.00 rather than [the] $2,000.00 provided in the original lease[,] but noted that the written lease would require $2,000[.00] a month. Stevenson never signed the new lease[13] and, as such, she remained a holdover tenant under the terms of the prior lease. Thus, any rental payments due after May 31, 2020[,] were the responsibility of Stevenson as the holdover tenant—not Munda as he had vacated the premises and notified [Eric] that he was not seeking renewal.

_____

[13] *But see Moudy v. West Virginia Pulp & Paper Co.*, 121 A.2d 881, 882 (Pa. 1956) ("Although a formal contract is to be thereafter executed, if the terms have been agreed upon[,] legal obligations may arise[.]"). Here, the trial court's finding that Stevenson held over instead of agreeing to a new contract is equally supported by the record.

Amended Trial Court Opinion, 1/26/23, at 8-9 (citations and brackets omitted).

We agree with the trial court. The record supports that, after May 31, 2020, Stevenson was the sole holdover tenant, and solely liable to Appellants because Munda, on April 9, 2020, properly provided his notice of termination to be effective at the end of May 2020. Further, Stevenson could not bind Munda to an extension of the lease without his consent. Although we affirm the trial court's disposition of this matter, our review reveals a minor calculation error that requires us to vacate the trial court's judgment and remand for correction.

The trial court correctly calculated that Appellees were jointly-and-severally liable for the missed March 2020 payment, the late fee incurred for that month and for May 2020, and the $15.00 bounced check fee for May 2020, all totaling $2,215.00. However, the judgment of the trial court must be corrected as to the amount for which Stevenson is solely liable to Appellants.

Stevenson missed rent payments for which she was solely liable for the months June 2020, December 2020, January 2021 through March 2021, and May 2021 through August 2021. This amounts to 9 months of missed payments for a total of $18,000.00. The lease agreement provided for a 5% ($100.00 per month) late fee for any late payments, which amounts to an additional $900.00. Stevenson also failed to maintain the Property in June and July of 2021 when she was solely liable, requiring Appellants to incur

- 16 -

$450.00 in expenses.  Therefore, the total for which Stevenson is solely liable is $19,350.00.

Order vacated. Case remanded with instructions to the trial court to enter judgment in favor of Appellants and against Appellees for $2,215.00 owed jointly-and-severally by Appellees, and for $19,350.00 for which Stevenson is solely liable.  Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/21/2024