J-S15018-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| JOHN-WALTER E. WEISER | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ALEXANDER D. BABIK | : | No. 1351 MDA 2022 |

Appeal from the Order Entered August 26, 2022
In the Court of Common Pleas of Adams County
Civil Division at No:  2021-SU-0000343

BEFORE:  BOWES, J., STABILE, J., and SULLIVAN, J.

MEMORANDUM BY STABILE, J.:                    **FILED: OCTOBER 6, 2023**

Appellant, John-Walter Weiser, appeals from an order denying his petition to enforce his settlement agreement with Appellee, Alexander D. Babik.  Appellant argues that the trial court erred by declining to determine that Appellee violated the non-disparagement clause of the settlement agreement by making deprecatory remarks about Appellant in a Facebook post and during a public meeting of a constable association.  We agree with Appellant that the evidence demonstrates that Appellee violated the non-disparagement provisions.  We reverse the trial court's order and remand for further proceedings concerning the relief due.

Appellant and Appellee were business partners in a cigar shop and members of the Commonwealth Constable Association ("CCA").  The two had a falling out, and on April 16, 2021, Appellant filed a civil complaint against Appellee and a petition for an injunction.  On May 28, 2021, Appellant and

Appellee dissolved their business partnership by entering into a settlement agreement ("Agreement").

Due to the hostility between the parties, the Agreement includes a non-disparagement provision in which each party agrees not to make "any disparaging communication about the other party." Agreement at 2. The Agreement defines "disparaging communication" as "a communication which is belittling, contemptuous, decrying, degrading, demeaning, denigrative, denigratory, deprecatory, depreciative, depreciatory, derisory, derogative, derogatory, detractive, disdainful, scornful, slighting, and/or uncomplimentary." *Id.* The Agreement states that if either party violates its terms, the non-violating party can seek injunctive relief via an order to prohibit further disparagement as well as counsel fees and costs incurred in the course of obtaining the order. *Id.* at 4.

On March 7, 2022, Appellant filed a motion to enforce the settlement agreement seeking an injunction against Appellee for disparaging communications and an award of counsel fees and costs. Appellant alleged that Appellee made disparaging statements about Appellant in a Facebook post on July 10, 2021 and during a CCA meeting on January 20, 2022. Appellee filed an answer to Appellant's motion and a counterclaim alleging four claims against Appellant.

On August 23, 2022, the court convened an evidentiary hearing concerning the parties' claims. The following evidence was adduced concerning Appellee's Facebook post. Subsequent to the Agreement, both

parties remained members of the CCA.  Appellant acted as president of the CCA from 2017 through 2020 and again in 2022.

On July 10, 2021, Appellant and Shawn Vinson were the only individuals running for president of the CCA in 2022.  Hrg., 8/23/22, at 8.  On that date, Appellee published a post on Facebook that stated in relevant part:

> As a previous board member recently resigned due to the corruption of past leadership . . . I highly recommend the people push for an external audit of the financial state of the CCA . . . We need to know where our money is and where it is spent.  Past leadership has abused our money.  Past leadership has claimed our money as their own.  Let[']s unite together to ensure our money is ours, not a single person[']s.  Let's take back the CCA like Shawn Vinson has been trying to do.  Shawn will put us in the right direction.  He is not corrupted.  He will do what is right for the people.  He will not steal from an association he stands for. Vinson is the only option.  Vinson will bring us out of this.  I (as an active constable) will not be victim of an association leadership being controlling and racist.

Appellant's Exhibit 2.  Immediately following this post, Appellant sent a letter through his counsel instructing Appellee to stop making disparaging communications.  Subsequently, Appellant was elected President of the CCA.

In response to Appellant's prehearing requests for admission, Appellee admitted that (1) he made the Facebook post, (2) Appellant was running for president of the CCA in the upcoming year (2022) at the time of the post, and (3) Appellee supported Shawn Vinson for president of the CCA.  Appellee testified during the hearing that he published the Facebook to "get people to vote for" Vinson.  Hrg. at 112.  Appellee did not introduce evidence that anyone was running for president besides Appellant and Vinson.

Appellee admitted that he intended to group and refer to Appellant Weiser as one of those people in the "past leadership" who were corrupt, racist, and abusing the CCA's money, even though he did not expressly state Appellant's name in the post:

> **Counsel for Appellant**: I'm asking just a simple direct question. Are you referring to [Appellant] as controlling and racist in this Facebook post; yes or no?
>
> **Appellee**: I already answered that question multiple times.
>
> **The Court**: Answer that question, sir.
>
> **Appellee**: Not directly, no, but I am grouping him into the group of all who were board members of the association.
>
> **Counsel for Appellant**: So you are grouping him in being someone as controlling and racist?
>
> **Appellee**: It could be under that category, correct.
>
> **Counsel for Appellant**: Not could be. You just said under oath you are lumping him in with this group of past leadership that's controlling and racist, correct?
>
> **Appellee**: Correct. He's in that group, yeah.
>
> **Counsel for Appellant**: And you're lumping him in with the past leadership that he abused money, correct?
>
> **Appellee**: He potentially could have abused money, correct.
>
> …..
>
> **Counsel for Appellant**: You're telling people who read this Facebook post whoever read it, members or whatnot, that [Appellant's] part of the past leadership that has abused our monies, claimed those monies as their own and this is controlling and racist?

**Appellee**: At no point did I say his name. I said the board members, past board members.

**Counsel for Appellant**: No, but you already testified what you were referring to past leadership includes [Appellant]?

**Appellee**: Correct, but it doesn't name him directly.

*Id.* at 110-12.

The evidence concerning the January 20, 2022 CCA meeting is as follows. On that date, Appellant presided over a CCA meeting as president, and Appellee attended in the audience. Approximately six persons attended the meeting, and 125 persons viewed it online. *Id.* at 11. During the meeting, Appellee asked about a supposed investigation by the Attorney General's Office into the CCA's financial irregularities. Appellant answered and then added, "But I also think to sit here and act like we don't know where that may have stemmed from would be kind of foolish." *Id.* at 20. Appellee asserts this was directed at him. Following these remarks, Appellee responded, "I am not going to go through these BS games of you doing whatever you are doing," "this is not fun anymore, I want you out of my life, to leave me alone," and "stop stalking me." *Id.* at 12. Appellee was looking at Appellant when he made these remarks. *Id.* Appellee admitted that he directed these statements to Appellant. Appellant's Exhibit 2 (Appellee's response to requests for admission). Appellee further testified that he used the term "stalking" because Appellant had followed him after he left a cigar store in February 2021. Hrg. at 94, 114. The court took judicial notice of the fact that

- 5 -

stalking is defined as a criminal offense in the Crimes Code. *Id.* at 12 (citing 18 Pa.C.S.A. § 2709.1, the crime of stalking).[1]

On August 26, 2022, the court denied Appellant's motion to enforce the settlement agreement and his request for counsel fees. The court also denied Appellee's counterclaims. The court declined to enforce the settlement agreement on the ground that the non-disparagement provision in the settlement agreement was ambiguous:

> The Agreement's Non-Disparagement provision presented before this court attempts to define the term "disparaging" by providing a host of other synonyms. Yet, the broad definition of the term compels this court to find that the term is ambiguous. The all-encompassing term, "disparaging," could be constructed differently and understood in several ways depending on the context in which the statement is made. The agreement prohibits "disparaging" communication "about the other party." Importantly, there is no suggestion in the Agreement as to whether general statements that do not specifically mention the other party could be construed as disparaging against the other party through inference, implication or innuendo. The dictionary definition of "disparaging" is a statement "meant to belittle the value or importance of someone or something." Merriam-Webster.com Dictionary, *s.v.*[2] "disparaging." There is an element of intent in the definition. Here, neither party mentioned the other specifically or directly or by name in any of the complained of statements. No intent to belittle the Appellant can be discerned from [Appellee's] remarks.

_____

[1] Section 2709.1 grades stalking as a first-degree misdemeanor for most first offenses and as a third-degree felony for second and subsequent offenses. *See* 18 Pa.C.S.A. § 2709.1(c).

[2] The term "s.v." stands for "sub verbo," a Latin phrase meaning "under the word."

Pa.R.A.P. 1925 Opinion, 10/31/22, at 5. The court then determined that neither the Facebook post nor the statement during the CCA meeting was disparaging:

> With regard to the Facebook post, [Appellee] only provided general communications regarding the entire leadership board during an election cycle. The statements were generalized without specificity to time or person. Though Appellant and two other members of the CCA, who were friends of Appellant, thought that the [Appellee] "probably" targeted Appellant with his communications, there is nothing within the July Facebook post directed toward Appellant unambiguously. Rather, [Appellee] posted generalized critiques of the leadership of the CCA that could apply to any previous leadership member as far back as 1985 when the CCA was created. Appellant's own witnesses testified that the statements could be directed toward other members of the leadership board, particularly the treasurer of the CCA.
>
> Similarly, this Court does not believe the other, barely audible, statements made during an exchange occurring between BOTH parties can be construed as disparaging statements in the context in which they were made. They were not intended to belittle Appellant but were rather a request to refrain from certain actions, and an expression of [Appellee]'s frustration. Despite Appellant's efforts to portray the "stop stalking me" statement as a direct accusation of criminal behavior, this Court discerns that the use of the word "stalking" was no more than a generalized statement asking one person to leave the other alone.
>
> It is also noted the exchange was initiated by Appellant. Viewing the recording of the meeting, it is evident [Appellee] was the subject of discussion between Appellant and at least one other board member outside of the public meeting.

*Id.* at 5-6.

Appellant filed post-trial motions, which the court denied, and a timely notice of appeal on September 23, 2022. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises the following issues in this appeal:

1. Whether the lower court committed an error of law and/or abused its discretion in finding that Appellee did not violate the non-disparagement provision of the parties' settlement agreement when he told Appellant to "Stop stalking me" at a meeting of the CCA which was witnessed by numerous members and others?

2. Whether the lower court committed an error of law and/or abused its discretion in finding that Appellee did not violate the non-disparagement provision of the parties' settlement agreement when he published a Facebook post dated July 10, 2021, where:

a) this Facebook post expressly referred to "past leadership" of the CCA as being corrupt, racist, and having "abused our money";

b) this Facebook post was published during an election for the 2022 President of the CCA which had only two (2) candidates running, with Appellant as the only challenger and the only member of the "past leadership" running against Appellee's candidate (Shawn Vinson);

c) the witnesses who testified at the hearing understood and believed that Appellee was referring to Appellant as part of the "past leadership" that was corrupt, racist, and abusing money in this Facebook post since he was the only challenger running for the 2022 President position against Appellee's candidate (Shawn Vinson), and they viewed those comments as being negative and disparaging about Appellant; and,

d) Appellee himself testified that he included Appellant in the "past leadership" being referred to in the post as being corrupt, racist, and having "abused our money" when he made that Facebook post in support of his candidate (Shawn Vinson) and against Appellant (who was the only candidate running against Mr. Vinson)?

3. Whether the lower court committed an error of law and/or abused its discretion in denying Appellant's request for the issuance of an order to prohibit Appellee from making future disparaging communications, and denied Appellant's request for

an award of reasonable attorney's fees and costs in bringing the enforcement motion, where:

a) Appellee had made one or more disparaging communications against Appellant in violation of the parties' settlement agreement;

b) Appellant had incurred reasonable attorney's fees and costs to enforce the settlement agreement based upon the work required to be done in response to Appellee's litigation strategy, and no time entry or cost was disputed as being unreasonable at the hearing; and,

c) the parties' settlement agreement expressly provided for such relief?

Appellant's Brief at 5-6 (cleaned up). Appellee did not appeal the denial of his counterclaims or file a brief in the present appeal.

In his first two arguments, Appellant contends that the trial court erred by concluding that Appellee did not violate the non-disparagement clause of the settlement agreement in his Facebook post or during the CCA meeting. We agree with Appellant. Contrary to the trial court's decision, we hold that (1) the non-disparagement clause is clear and unambiguous, and (2) Appellee disparaged Appellant under the plain language of the clause.

In an appeal from an order denying enforcement of a settlement agreement, our standard of review is as follows:

The enforceability of settlement agreements is determined according to principles of contract law. Because contract interpretation is a question of law, this Court is not bound by the trial court's interpretation. Our standard of review over questions of law is *de novo* and to the extent necessary, the scope of our review is plenary as [the appellate] court may review the entire record in making its decision . . . With respect to factual conclusions, we may reverse the trial court only if its findings of

fact are predicated on an error of law or are unsupported by competent evidence in the record.

***Mastroni-Mucker v. Allstate Ins. Co.***, 976 A.2d 510, 517-18 (Pa. Super. 2009).

It does not appear that any Pennsylvania appellate court has had occasion to address whether the terms of a non-disparagement provision in a settlement agreement are ambiguous. Even so, the standards governing claims of contractual ambiguity are well demarcated, and we will apply them here.

The first step in resolving a claim of ambiguity is to "look to the writing itself, for if [its] terms are clear and precise, performance must be required in accordance with the intent as expressed in the agreement without resort to rules of construction or extrinsic evidence." ***Circle K, Inc. v. Webster Trustee of Webster Irrevocable Grantor Trust***, 256 A.3d 461, 464 (Pa. Super. 2021). "[W]hen the language of a contract is clear and unequivocal, courts interpret its meaning by its content alone, within the four corners of the document." ***Dressler Family, LP v. PennEnergy Resources, LLP***, 276 A.3d 729, 736 (Pa. Super. 2022). When a contract does not define a particular word, we look to the word's natural, plain, and ordinary meaning, and we inform our understanding of the word by considering its dictionary definition. ***Ungarean v. CAN***, 286 A.3d 353, 380 (Pa. Super. 2022).

"Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the

language they employed." ***Mitch v. XTO Energy, Inc.***, 212 A.3d 1135, 1138-39 (Pa. Super. 2019). "[T]his Court need only examine the writing itself to give effect to the parties' understanding. [We] must construe the contract only as written and may not modify the plain meaning under the guise of interpretation." ***Id.*** "A court must not distort the meaning of the language or resort to a strained contrivance to find an ambiguity." ***Dominic's Inc. v. Tony's Famous Tomato Pie Bar & Restaurant, Inc.***, 214 A.3d 259, 268 (Pa. Super. 2019).

Here, the settlement agreement provides that each party shall not make "any disparaging communication about the other party." The agreement defines "disparaging communication" as "a communication which is belittling, contemptuous, decrying, degrading, demeaning, denigrative, denigratory, deprecatory, depreciative, depreciatory, derisory, derogative, derogatory, detractive, disdainful, scornful, slighting, and/or uncomplimentary." Agreement at 2. The term "and/or" establishes that a communication is disparaging if it fulfills any one of, or any combination of, the adjectives in the definition.

The trial court finds this definition ambiguous because it consists of a "series of synonyms." This is an error of law. These terms are unambiguous; their plain meanings are easily ascertainable on their face or by resort to a dictionary. For example, "demeaning" means "damaging or lowering the character, status, or reputation of someone or something," Merriam-

Webster.com., an easily understandable definition that we have no trouble applying to the evidence.[3]  Curiously, the court calls the contract's definition ambiguous even though its own definition of "disparaging" ("meant to belittle") mirrors one of the adjectives in the contract's definition ("belittling").

The court also asserts that the non-disparagement provision is ambiguous because it fails to specify "whether general statements that do not specifically mention the other party could be construed as disparaging against the other party through inference, implication or innuendo."  Opinion at 5. The court ultimately held that communications that did not specifically name the other party fell outside the non-disparagement provision.  This too was error.  This provision prohibits each party from making disparaging communications "about" the other party.  "About" is a preposition that means "with regard to: concerning," Merriam-Webster.com, a broad term that encompasses communications that concern the other party, either directly or by implication and innuendo.  The limitation imposed by the court runs afoul of the plain language of the non-disparagement clause and cripples its effectiveness by permitting the parties to disparage one another merely by omitting the other's name from derogatory statements.

---

[3]  Two terms, "denigrative" or "denigratory", do not appear in the dictionary, probably because they are ungrammatical.  Even so, the first eight letters of these terms obviously refer to the verb "denigrate," which means "to attack the reputation of; defame," **id**.

We hold that Appellee's first communication, the July 10, 2021 Facebook post, is disparaging under the definition in the parties' agreement. The Facebook post referenced the "corruption of past leadership" of the CCA and recommended an "external audit" of the CCA's finances. The post went on to assert that Shawn Vinson will "put [the CCA] in the right direction," because Vinson "is not corrupted" and "will not steal from an association he stands for." Although Appellee did not mention Appellant by name, Appellant was part of the CCA's "past leadership," having served as the CCA's president from 2017 to 2020. In addition, at the time of the post, Appellant and Vinson were the only persons running for CCA president in the upcoming year of 2022. Viewed with these facts as backdrop, the Facebook post was demeaning because it implied that Appellant was corrupt, had stolen from the CCA in the past, and would steal again from the CCA if elected president in 2022.

The trial court refused to find Appellee liable on the ground that the Facebook post was "generalized without specificity to time or person" and "there [was] nothing . . . directed toward Appellant unambiguously." Pa.R.A.P. Opinion, 10/31/22, at 5-6. This decision rests upon the court's error of law that the non-disparagement provision only applies to communications that directly name the other party. Construed properly, this provision also prohibits communications such as the Facebook post that disparage the other party implicitly or by innuendo.

We also hold that Appellee's statement to Appellant during the January 20, 2022 CCA meeting, *i.e.*, "stop stalking me," violated the non-disparagement provision. During the meeting, Appellee asked about an alleged investigation by the Attorney General's Office into the CCA's financial irregularities. Appellant answered in relevant part, "I also think to sit here and act like we don't know where that may have stemmed from would be kind of foolish." Appellee replied, "I am not going to go through these BS games of you doing whatever you are doing," "this is not fun anymore, I want you out of my life, to leave me alone," and "stop stalking me." Although the court downplays this statement as "no[thing] more than a generalized statement asking one person to leave the other alone," Opinion at 6, it clearly was demeaning because its plain import was to accuse Appellant of the crime of stalking. Thus, as a matter of law, this communication transgressed the non-disparagement provision.

The court also excused the "stalking" statement on the ground that "the exchange was initiated by Appellant." *Id.* at 6. Under the non-disparagement provision, however, it does not matter who began the exchange. All that matters is whether the content of any party's communication is disparaging. The "stalking" communication clearly was.

Due to the court's errors of law, we reverse the court's order refusing to enforce the non-disparagement provision. *Mastroni-Mucker*, 976 A.2d at

517-18 (order declining to enforce settlement agreement is reversible when trial court's decision rests upon error of law).

In his final argument, Appellant objects to the court's refusal to grant injunctive relief or award him counsel fees as a result of Appellee's violation of the settlement agreement. Having determined that Appellee's communications breached the settlement agreement, we conclude that the trial court should determine, in the first instance, the proper remedy for Appellee's violations. Accordingly, we remand this case in order for the court to consider Appellant's requests for injunctive relief and attorney fees.

Order reversed. Case remanded for further proceedings in accordance with this memorandum. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/06/2021